# APPENDIX.

## STATE vs. HOWARD A. CLEVELAND.

The statutes of this State require that the "jury, finding a person guilty of murder, shall find whether he is guilty of murder in the first or second degree."

Upon an indictment which charges the defendant with the crime of murder generally, without specifying the degree of the crime, a general verdict that the defendant is "guilty of the murder whereof he stands indicted," is not a finding that he is guilty of murder of the first degree, according to the provisions of the statutes in such cases made and provided.

At the February term of the supreme judicial court holden at Bangor, in Penobscot county, on the first Tuesday of February, A. D. 1869, the grand jury found the following indictment against Howard A. Cleveland:

### INDICTMENT.

"The jurors for the State aforesaid, upon their oath present, that Howard A. Cleveland, of Orrington, in the county of Penobscot, on the seventeenth day of November, in the year of our Lord one thousand eight hundred and sixty-eight, at Orrington, in the county of Penobscot, aforesaid, one Warren George, feloniously, willfully and of his malice aforethought did kill and murder against the peace of said State and contrary to the form of the statutes in such case made and provided. And the jurors aforesaid, upon their oath do further present, that said Howard A. Cleveland, at Orrington, in said county of Penobscot, on the seventeenth day of November, A. D. 1868, with force and arms, in and upon one Warren George, feloniously, willfully, and of his malice aforethought did make an assault, and that said Cleveland, a certain pistol then and there charged with gunpowder and one leaden bullet, then and there feloniously, willfully, and of his malice aforethought did dis-

charge and shot off to and against the said Warren George, and that said Howard A. Cleveland with the leaden bullet aforesaid, out of the pistol aforesaid, then and by force of the gunpowder aforesaid, by the said Cleveland discharged and shot off as aforesaid, then and there feloniously, willfully, and of his malice aforethought, did strike, penetrate, and wound the said Warren George on and upon the right shoulder of said George, near the lower part of the shoulder-blade of him, said George, giving to the said Warren George, then and there with the leaden bullet aforesaid, so as aforesaid discharged and shot out of the pistol aforesaid, by the said Cleveland in and upon the shoulder of the said George, near the lower part of the shoulder-blade, one mortal wound of the depth of ten inches and of the breadth of three-fourths of an inch, of which said mortal wound the said Warren George then and there instantly died.    And the jurors aforesaid, upon their oath aforesaid do say, that the said Howard A. Cleveland the said Warren George, in the manner and by the means aforesaid, feloniously, willfully, and of his malice aforethought did kill and murder against the peace of the State.    And the jurors aforesaid, upon their oaths do further present, that said Howard A. Cleveland, at Orrington, in said county of Penobscot, on the eighteenth day of November, A. D. 1868, feloniously, willfully, and of his malice aforethought did kill and murder one Warren George, and that the said Warren George then and there died of the wounds inflicted then and there by said Cleveland against the peace of said State and contrary to the form of the statutes in such case made and provided."

The defendant was tried at the February term, 1869, Appleton, C. J., presiding.    The record of the finding of the jury is as follows:

### VERDICT OF THE JURY.

" Said jury was sworn, according to law, well and truly to try the issue, who, after hearing all matters concerning the same, on the twenty-second day of the term, being the twenty-sixth day of February, A. D. 1869, return their verdict thereon, and say on oath that the said Howard A. Cleveland is " guilty of the murder whereof he stands indicted."

At a subsequent term of the court, Cutting, J., presiding, the defendant was sentenced to be hung as for murder of the first degree. The statutes of the State provide that such a sentence shall not be executed till the expiration of a year from the time it is passed. Before the expiration of the year it was ordered by the executive council that the justices of the supreme judicial court be required to give their opinion upon the following question, to wit:

*Did the jury by their verdict aforesaid find said Cleveland guilty of murder in the first degree, according to the provisions of the statutes in such cases made and provided?*

To this question the justices responded as follows:

OPINION OF APPLETON, C. J., ANSWERING THE QUESTION IN THE AFFIRMATIVE.

BANGOR, Dec. 5, 1870.

To the question proposed by the honorable council, I have the honor to answer as follows:

The indictment against Cleveland contains two counts, and the material question arising is, whether they or either of them charge murder in the first degree.

The first count, according to the uniform course of authorities in Massachusetts, New York, and this State, is a good one for murder in the first degree. It can only be deemed good for that offense, because it charges it. If not so, then all convictions of murder in the first degree, under similar indictments, must be deemed erroneous; for if the first count does not aptly and sufficiently describe murder in the first degree, no finding of the jury can supplement the insufficiency of the indictment, for no finding can increase the offense, nor add to the indictment what is not therein contained. "If that crime (murder in the first degree) is not charged," observes Bigelow, C. J., in *Green* v. *Com.*, 12 Allen, 171, in reference to an indictment like the present, "in an indictment so framed, then it must follow that the offense is not described to the accused in a full, plain, and substantial manner, as required by the constitution, unless it can be said that an indictment, which does not include a description of an offense, is a compliance with the constitution, a proposition which is manifestly absurd."

Murder in the first degree and murder in the second degree, though embraced in the same general term, are different offenses, indicative of different degrees of guilt, and receiving different punishments. The degrees of murder indicate different degrees of criminality precisely as they are indicated in the different kinds of arson, larceny, or assault with varying intent and under different and changed circumstances. No indictment can be so worded as in one count to describe accurately different offenses. If the indictment undertakes to describe different offenses, it must use different language, for there must be different elements constituting each different offense, else the offenses would not be different. If the indictment describes only murder in the second degree, a prisoner cannot be convicted of murder in the first degree. It is an elementary principle of criminal law that a jury cannot convict a person of any crime, however clearly proved, unless it is duly and technically set forth in the indictment. But the instances are numerous of generic offenses, when in an indictment for a greater the jury may convict of a lesser offense, which is included in the greater. Thus, in an indictment for an assault with intent to kill, the accused may be convicted of an assault simply. So, under an indictment for murder in the first degree, one may be convicted of murder in the second degree or of manslaughter; but if the indictment does not set forth murder in the first degree, there can be no conviction of that offense by any possible finding of the jury. A verdict for the greater offense can only be sustained when the indictment in and of itself describes such offense.

If it be not conceded that the first count sets forth murder in the first degree, all convictions under similar counts are erroneous,'unless we are prepared to hold that a man can be convicted of an offense other and greater than that with which he is charged.

By an act passed in 1865, c. 329, the legislature determined what should be a sufficient indictment in capital cases of murder,— that is, of murder in the first degree, the offense of murder in the second degree not being a capital offense. The second count is in the form prescribed by statute, and must be deemed for murder in the first degree.

Now the statute, c. 118, § 4, requires the jury finding a person

guilty of murder to find whether he is guilty of murder in the first or second degree. It prescribes no formula. It only requires a finding of the degree. If the indictment is for murder in the first degree, and the jury find the prisoner "guilty of the murder whereof he stands indicted," it requires optics sharp to perceive how it can be that they do not find him guilty of murder in the first degree. The prisoner stands indicted of murder in the first degree; the verdict is guilty of the murder whereof he stands indicted, not of what he is not indicted, nor of a lesser degree of criminality. If the jury find the prisoner guilty of a lesser offense, they say so. If not, he is guilty as he is indicted and not otherwise.

There is a large class of offenses in which two or more offenses are or may be embraced in a greater. Thus, under an indictment for an assault with intent to kill, the person may be convicted of an assault. Under an indictment for carnal ravishment, the prisoner may be convicted of an assault with intent to commit a rape or of an assault. But when the charge is of the highest offense, the verdict of guilty is regarded as of the offense as charged. So if the indictment sets forth the different degrees of the generic offense in different counts, the finding of guilty is of the highest offense described in the indictment. If there is to be a reduction, it must be by a special finding.

In accordance with the universal rule in criminal procedure, the verdict of guilty, as in the present case, is of the offense charged, and none other.

The division of murder into two degrees was first enacted in Pennsylvania in 1794, and their statute prescribes that "the jury, before whom any person indicted for murder shall be tried, shall, if they find such person guilty, ascertain by their verdict whether it be murder in the first or second degree." This provision is almost identical with our R. S., c. 118, § 4. It was held in Pennsylvania, in *White* v. *Com.*, 6 Binn. 179, that when the indictments show the offense to be of the first degree, that "all that a jury need do, would be to find the prisoner guilty in manner and form as he stands indicted." In *Com.* v. *Earle*, 1 Wharton, 531, the doctrine was reaffirmed, the court remarking, that "the provision for the

ascertainment of the degree by verdict was intended for cases in which the jury might be at liberty to find the prisoner guilty in the second degree; but when the indictment sets forth murder in the first degree, they hold a special finding unnecessary and nugatory. The jury, by finding the prisoner guilty as he stands indicted, have made the indictment a part of the verdict, and the case is to be regarded precisely as if they found a special verdict stating the facts as they are set forth in the indictment.

A similar provision is found in Indiana. It was there held, that when the indictment charged the prisoner with murder in the first degree, that a verdict finding him "guilty in manner and form as he stands charged in the indictment," is a finding of guilty of murder in the first degree. The court say, "the jury find him guilty in manner and form as he stands charged. This evidently refers to the specific charge contained in the indictment. Of what, then, does he stand charged? Why, of murder in the first degree. There is indeed no ground of objection to the verdict." *Kennedy* v. *The State*, 6 Porter, 485.

In New York, murder is divided into different degrees. After an elaborate examination of the authorities, it was there repeatedly and unanimously held in their highest courts that the common-law count for murder, like the first count in the indictment under consideration, was a good one for murder in the first degree. In accordance with the universal rule that where lesser crimes are included in a greater, the finding of guilty is a finding of the greater, it was held that a finding of guilty to an indictment, like the one under consideration, was a finding of guilty of murder in the first degree. "The result most clearly is," observes Woodruff, J., in *Fitzgerald* v. *The People*, 37 N. Y. 424, "that the crime of murder is sufficiently charged, when alleged as in the present indictment, 'with malice aforethought' . . . And a verdict of guilty, as charged in the indictment, is a finding of guilty of murder in the first degree; and judgment and condemnation to the punishment awarded to that crime necessarily follow." The same question subsequently arose in *Kennedy* v. *The People*, 39 N. Y. (12 Tiffany) 244, and it was again held that an indictment in the common-law form, charging the killing with malice aforethought is

good, notwithstanding the statute has divided the crime of murder into different degrees; and a verdict finding the accused "guilty as charged in the indictment," is a conviction of murder in the first degree.

The object of the provision found in § 4 was in reference to the degrees of crime and the consequent measure of its punishment. The jury may find the highest degree as they do where, on an indictment for murder in the first degree, they find the prisoner guilty of the crime as charged, or they may reduce the degree of guilt by a special finding. Unless the crime charged is reduced to a lesser crime by a special finding, the conviction is of the offense set forth in the indictment, and none other.

The jury found Cleveland guilty of the offense charged. It is not questioned that pertinent and proper instructions were given. If the offense charged is murder in the first degree, they have affirmed the guilt as charged. They might have found the lesser crime of murder in the second degree, but they did not. If the indictment does not describe the offense of murder in the first degree, no finding of the jury could enlarge the offense charged in the indictment.

I believe it is admitted that the indictment charges murder in the first degree, and the truth of this charge having been affirmed by the jury without qualification, I am of opinion that Cleveland was duly convicted of murder in the first degree, and is amenable to the penalties of the law for the offense thus charged and of which he was convicted as charged. I have the honor to be

Your obedient servant,

JOHN APPLETON.

*To the Honorable the Council of Maine.*

OPINION OF CUTTING, J., ANSWERING THE QUESTION IN THE AFFIRMATIVE.

In answer to the request of the honorable the council, I submit the following reply:

At the trial I did not preside, but at a subsequent term, after all objections as to the prior rulings and findings had been waived, on

motion of the attorney-general, as the judge presiding, I was required to pronounce the sentence of the law. Thereupon I examined the record of the former conviction, on the exhibition of which I found that the prisoner had been indicted for murder in the first degree, and that the verdict of the jury was that he was " guilty of the murder whereof he stands charged."

I was aware of the statute which requires " the jury, finding a person guilty of murder, to find whether he is guilty of murder in the first or second degree." I then and still entertain the opinion that the finding of the jury was a strict compliance with the statute, that it was a finding of murder in the first degree, of which the prisoner stood charged. A further finding would have been superfluous. To the judicial mind all arguments to the contrary must be considered as poor logic, and adverse to adjudications in the highest courts in this country. If there be any decisions to the contrary, the finding, " as stands charged," was no part of the record. But whether my conclusion was right or wrong, I pronounced the sentence, and the judgment and record of the court was made accordingly, and that judgment must stand as the guidance of the executive until removed on a writ of error, as prescribed by statute.

Neither the prisoner or his counsel has seen fit to claim such a process, upon which alone, if error was committed, could redress be had after a hearing of both parties.

Now I would respectfully suggest to the council asking my opinion, whether there is any statute or law constituting them a court for the hearing of errors in criminal matters. If they answer in the affirmative, then they assume judicial powers and usurp jurisdiction in the last resort, in all cases of misdemeanors and felonies, whenever there shall be a petition presented for a pardon.

JONAS CUTTING.

. OPINION OF KENT, J., ANSWERING THE QUESTION IN THE
NEGATIVE.

BANGOR, Dec. 5, 1870.

*To the Honorable Council of the State of Maine :*

I have the honor to acknowledge the receipt of a copy of the vote of the council, requiring the opinion of the justices of the supreme judicial court in relation to the effect of a verdict in case of one Howard A. Cleveland.

I deem it proper, before considering the question proposed, to say most respectfully, but frankly, that I have entertained a strong doubt whether it is one which comes within the scope and intent of the constitutional provision which requires the justices to give their opinions to other departments of the government. This hesitation did not arise from any doubt of the importance of the question of law propounded. It is, undoubtedly, a very important one to the prisoner. But it is not an abstract question of law, and does not ask for an opinion on such question, disconnected from an individual case. It asks for an opinion as to the effect of a certain verdict, in a certain case, against one Howard A. Cleveland.

If I can properly look only at the part of the record furnished with the question, and the basis of it, I find a copy of an indictment and of a verdict of the jury. There is nothing to indicate whether there have been any subsequent proceedings in the case, and nothing to negative the pendency of the case in the court, which must yet pass upon this question of the legal effect of the verdict.

If I look beyond these documents at the whole record in our court, I find that all exceptions have been withdrawn or overruled, including explicitly the question now proposed, and that sentence of death has been passed upon Cleveland, for murder in the first degree. I find that these proceedings were before the court, held by a single judge, as provided by law, and are binding on all until reversed or modified by a judgment on a writ of error. But they are open to revision on such a writ, and the prisoner has a legal right, with the consent of any judge, to such writ of error.

In either view of the facts, the case has not passed beyond the jurisdiction of the court, and the prisoner may bring this precise

question before the court for decision. Might he not, in such an event, justly complain that his case had been prejudged, on this vital point, by all the judges, without any opportunity on his part to be "heard by himself or his counsel," and that, therefore, he has not enjoyed a constitutional right, but has been deprived of an "impartial trial?"

It is true, unquestionably, that the opinions, given under a requisition like this, have no judicial force, and cannot bind or control the action of any officer of any department. They have never been regarded as binding upon the body asking for them. Whatever the several opinions of the justices may be in this case, they cannot, in any degree, alter, annul, or qualify, or add any force to the judgment already given by the court. This must stand in full force until reversed or modified by judicial action, or commuted, or the prisoner is pardoned by executive powers.

The objection is, therefore, to the prejudgment of a vital question without hearing the party whose life may be dependent upon the decision. Judicial tribunals are excusable if they are sensitively reluctant to strike before hearing. I am not unmindful of the unlimited language of the constitution, in which authority is given to certain departments to require the opinion of the justices of the court "upon important questions of law, and upon solemn occasions. But it must be obvious to any reflecting mind that there is a limit to this power, and to the obligation to answer. When a compliance would violate distinctly and palpably some other constitutional provision, made for the protection of individual rights, or involve a prejudgment of a pending case, by opinions on the points in issue, a conscientious judge may well hesitate or even decline answering.

I am quite sure that no department would, in the exercise of this authority, intentionally overstep the bounds I have indicated. But in testing a principle, we may adduce improbable, but not impossible cases. If, by any means, a private litigant could induce one of the departments to ask the opinion of the justices on the controlling points in his lawsuit with his neighbor, touching their private rights, forwarding with the questions a copy of the papers in the case, would the justices be "obliged" to answer?

Or even if the State itself was a party in a civil suit, to recover land from a private citizen, would the justices be " obliged " to give their opinion in advance, as to the validity of the title of the State or as to the effect of a verdict?   In a criminal proceeding the State is a party, and so is the accused, and he is entitled to be protected in his right to an impartial trial, as fully as the State.

It seems to me that the supposed cases  clearly illustrate, if they do not demonstrate, my proposition, that there is a necessary limit to the generality of the language used in the constitution.

I have made these preliminary remarks in the  nature of a protest, to prevent any inference or conclusion from their omission.

I understand that all the other justices have already returned answers to the question proposed.   We have had no opportunity for concert. or consultation.   I do not suppose that an absolute refusal on my part to comply with the requisition of the council could be of any avail to prevent what I may deem an unfortunate precedent.

I am the more readily reconciled to the course I have concluded to adopt, by the fact that the result of my examination, since I determined to give the opinion asked for, is not adverse or injurious to the prisoner, and by the further fact that any opinion given in this summary manner, and without argument, cannot have any authoritive force in any possible future proceedings in the case.

I will, therefore, answer according to my present convictions and views of the law, as applicable to the precise question presented.

### ANSWER.

The answer to the question must depend upon  the construction of our statute in connection with constitutional provisions.   In some respects they are different from those of other States on this subject.

Until the revision of the statutes in 1841, there was no other definition of murder than this: " if any person shall commit the crime of willful murder, . . . he shall suffer the punishment of death."   Chap. 2, Laws of 1821.   There was no distinction between different degrees, and it was left to the common law to define the crime.

In the revision of 1841, followed in that of 1857, the legislature undertook to define exactly the offense of murder in these words: "Murder is the unlawful killing of a human being with malice aforethought." This is a single, distinct, and independent crime. The essential characteristic, which distinguishes it from other distinct offenses, is, that it is committed " with malice aforethought." This constitutes murder. The malice aforethought may be either express or implied. But it is murder in either case, and the definition is complete by the use of the words, " malice aforethought," without any addition, qualifying or intensifying the malice aforethought.

I have no doubt, without the statute of 1865 (c. 329), which expressly declares that an indictment like this shall be sufficient in all cases of murder, that, at common law, and under the statute definition, it is sufficient to justify a finding of a verdict of guilty of murder.

It is said that it does not justify the finding that the murder is in the first degree. It was otherwise decided in our court in *State* v. *Verrill*, 54 Maine, 515. It is also contended that a general verdict of guilty is equivalent to a finding of guilty in the first degree, because it is necessarily a finding of all that is charged in the indictment. The solution of the whole matter, as it seems to me, depends upon the decision of the question, whether murder is a single and simple offense, or whether there are two distinct offenses created by the provisions respecting degrees.

It seems to me that it was not the intention of the legislature to create distinct offenses, but one generic crime which might have different degrees of criminality, which degrees might be ascertained in view solely of the punishment to be inflicted.

The language used corroborates this view. The statute defines, in the first and separate section, the offense of murder; and then in subsequent sections says that when murder (*i. e.* as before defined) is committed, with express malice aforethought, it shall be deemed murder of the first degree, and when otherwise committed, murder of the second degree.

If it had been the intention of the law makers to make two distinct offenses, as distinct as murder and manslaughter, or murder

and arson, there would seem to have been no necessity, nor even any proper place, for this definition of murder as a distinct crime. It clearly was not the intention to make three offenses; one, murder, pure and simple,—one, murder in the first degree,—and one, murder in the second degree.

In the case supposed of an intention to make distinct and independent crimes, all that was required was for the legislature to say, " Whoever kills, etc., a human being unlawfully, with express malice aforethought, shall be deemed guilty of murder in the first degree, or of homicide (if they choose thus to distinguish and name it), and be punished by death." And in the next section a like definition, changing the word " express " to " implied," and designating the offense as murder, or murder in the second degree, or by any other name for the crime. These two offenses would include every case of murder, and the general definition of murder would be useless if not absurd. If we had such sections, clearly creating distinct offenses, I do not see how an indictment could be good, under the first, which did not in terms declare that the killing was with express malice aforethought; and I do not think that even legislative sanction could make it sufficient.

But it seems to me plain, that the sections which refer to the degrees were intended to regulate the punishment of the murder established under the first section. The murder might be shown under an indictment conforming to the definition, and a verdict of " guilty of the murder whereof he stands indicted," finds him guilty of all that is charged. But the punishment of the murder is a distinct matter. The statute here comes in and says that another duty shall be performed by the jury, after finding a person guilty of the murder charged, viz., to find the degree as before defined. Strictly, this is no finding under the indictment which relates only to murder as charged, but is a superadded duty to enable the court to apportion the punishment of the murder found. This would have been unnecessary, or superfluous, if the two degrees were distinct and independent crimes, as before explained, or if it was intended that the jury might, under a charge for a higher crime, reduce it to a distinct, lower offense, included in the one specified in the indictment. That power has always existed in all criminal proceedings and did not require this new enactment.

My conclusion is, that the general verdict of guilty, as charged, was properly rendered under this indictment, but I do not think that a sentence of death can be passed without other finding named in the statute. The indictment does not, in terms, cover the charge of express malice aforethought, and the jury have not, by their verdict or answers, given to the court the fact on which alone such sentence of death can be passed. The statute says that the jury shall find the degree. The indictment no more charges one degree than the other. It charges only murder, and the verdict convicts of murder, *i. e.* of killing a human being with malice aforethought. Whether this malice was express or implied is another question to be determined, not necessarily to fix the statute crime on the accused, but to affect the extent of the punishment.

If there could be any doubt of the intention of the legislature in these enactments, it is made plain by the subsequent enactment, which, I believe, is not to be found in the statutes of other States. To meet all possible contingencies it is, by our statute, further provided, that, " when a person is found guilty of murder by confession in open court, the court, from testimony, shall determine the degree of murder, and sentence accordingly."

This plainly shows that a general plea of guilty to an indictment charging, like this, the offense of murder, is not an admission of murder in the first degree. And yet it is as clearly a confession of all that is charged, as a general verdict of guilty is a conviction of all charged in the indictment. But before sentence, the court, after such a plea, must hear testimony and determine the degree. The court, in this respect, is in the same place that a jury is after it has determined that the prisoner is guilty of murder as charged. The confession, in open court, is, as the statute declares, a finding that the prisoner is guilty of murder. The further examination is to apportion the punishment. The court has no constitutional power to try and determine the question of guilt, as charged, or any question of fact constituting the offense. But all that relates to punishment is in the province of the court, and it may, therefore, inquire into the degrees of guilt in the murder found by confession.

I, therefore, answer that in my opinion the jury did not, by the verdict rendered, find Cleveland guilty of murder in the first degree.                                   EDWARD KENT.

OPINION OF DANFORTH AND WALTON, JJ., ANSWERING THE QUESTIONS IN THE NEGATIVE.

The undersigned have the honor to submit the following answer to the question proposed by the honorable council to the justices of the supreme judicial court by their order of Nov. 1, 1870.

By the R. S., c. 118, § 1, murder is defined to be "the unlawful killing of a human being with malice aforethought, either express or implied."

By § 2 of the same chapter, it is enacted, that, "When murder is committed with express malice aforethought, or in perpetrating or attempting to perpetrate a crime punishable by death, imprisonment for life, or for an unlimited term of years, it shall be deemed murder of the first degree, and punished with death."

Sect. 3 enacts that, "When murder is committed otherwise than is set forth in the preceding section, it shall be deemed murder of the second degree, and punished by imprisonment for life."

It will be seen that the first section gives a general definition of murder. The next two sections contain definitions not of distinct crimes, but of different degrees of the same crime. The crime is one, the degrees are two. The law does not require the indictment to set out the different degrees. It is sufficient if it sets out the crime of murder without alleging it to be of either degree, or it may set out the crime so as to bring it within the definition of the one degree or the other. *State* v. *Verrill*, 54 Maine, 408.

The indictment against Cleveland does not allege that he committed the murder "in perpetrating, or attempting to perpetrate, a crime punishable by death, imprisonment for life, or for an unlimited term of years," nor that it was done "with express malice aforethought."

The words are simply "of his malice aforethought." This language is the proper form of setting out implied malice as well as express. Hence the indictment does not necessarily set out any distinctive element of murder in the first degree. There is nothing in it which we should not expect, or which the law does not require, in murder of the second degree. It is true, the indictment is sufficient to authorize a conviction of murder in the first degree

if the testimony would warrant it; but it is equally true that there is nothing in it in this respect which is not necessary to warrant a conviction of murder in the second degree. Simply saying he did the act " of his malice aforethought" gives no information legally as to whether that malice is express or implied. If express, the murder would be of the first degree; if implied, of the second degree, and whether one or the other, is to be ascertained from the testimony.

It necessarily follows, that assuming all the allegations in the indictment to be true, we have no information as to whether the murder is of the first or second degree.

Turning our attention to the verdict of the jury, we find no additional information there. That only tells us " that the said Howard A. Cleveland is guilty of the murder whereof he stands indicted." But of what murder is he indicted? We have already seen that it does not appear from the indictment whether it is of the first or second degree. That depends upon the testimony, and of this the jury have said nothing. They leave us in entire ignorance of the conclusion (if any) to which they have come upon this point. The most that can be said of this verdict is, that it refers to and thereby makes the indictment a part of itself. In this view it becomes a special verdict, finding just such facts as are set out in the indictment, and no more. So that the verdict renders us no assistance in our pursuit of the important fact in the case, the degree of the murder, or whether the malice be express or implied.

But we are not left to inference alone in this construction of the statute. Sect. 4 of the same chapter would seem to leave no doubt as to its meaning. By that section it is provided that the jury, if the case goes to them, or upon confession of the accused, the court upon testimony are to determine the degree of the murder. This provision is peremptory and unqualified in its terms, leaving nothing to inference, but comprehending all cases, whatever may be the form of the indictment. The provision is thus express that it may be certain that the jury have not only had their attention called to the matter, but that they have considered and decided this important question of fact. And why should there be any hesitation in

giving full force to a provision of the law so explicit? It is not a matter of mere form, but a question of fact vital to the issue, and one to be settled by the testimony, and not from the papers in the case. This question of fact is certainly of the highest importance to the respondent, for upon its decision depends the degree of punishment to be inflicted, whether it be death or otherwise. As already seen in this case, we have no evidence from the record that the question of degree was passed upon by the jury. On the other hand, from the absence of any allusion to it in the verdict, the inference is irresistible that it was not considered by them. If, then, it is a fundamental principle of law, incorporated into our constitution, that the accused shall be entitled to " demand the nature and cause of the accusation," and have all the facts upon which the accusation is based settled by a jury, the same fundamental law would seem to require that a judgment of " guilty of murder in the first degree " should not go against the respondent till the record shows clearly that the jury have decided all the facts upon which that crime rests.

In accordance with these views, it is believed will be found nearly or quite all the judicial decisions in this country where the question has been raised. In most, if not all the States of the Union, will be found statutes upon this subject similar to our own, and not unfrequently has this same question been adjudicated.

In *Kennedy* v. *The State*, 6 Ind. 485, it was held, that the jury need not state the degree in their verdict because murder in the first degree was charged specifically in the indictment.

In *White* v. *Commonwealth*, decided in Pennsylvania and reported in 6 Binny, 182, which has sometimes been relied upon as an authority the other way, the question now under discussion was not raised by the facts in the case, and it is not, for that reason, an authoritative decision.

In *Commonwealth* v. *Earl*, decided in the same State and reported in 1 Wharton, 525, it was held, that a verdict similar to the one in Cleveland's case was sufficient to authorize the court to pass such sentence as the law provided for murder in the first degree. This decision, however, rests upon the fact that the indictment alleged the murder to have been accomplished " by means of poison,"

which, by the law of that State, is necessarily murder in the first degree.

But in the later case of *Johnson* v. *The Commonwealth*, 24 Penn. State, 386, where the indictment as in Cleveland's case did not necessarily show murder in the first degree, the court, in a very elaborate and able opinion, came to the conclusion that a verdict like the one under consideration did not authorize a judgment of murder in the first, but only in the second degree. Lewis, C. J., in the opinion of the court, says, "they (the jury) have found the prisoner ' guilty in manner and form as he stands indicted ' without otherwise ' ascertaining ' the degree. They have thus made the indictment a part of their verdict ; and we are to consider the case as if they had found a special verdict, stating the facts precisely as they are set forth in the indictment. We have seen that the language of the indictment applies as appropriately to the second as to the first degree."

In *State* v. *Dowd*, 19 Conn. 388, the court held, under statutes similar to our own, that in " all cases of murder the degree of criminality must be found as matter of fact ; " and without an express finding of murder in the first degree, the court would not be authorized to inflict the punishment prescribed by law for that offense.

The same doctrine has been held in other States, as appears by the following cases : *Dick* v. *The State*, 3 Ohio, 89 ; *Parks* v. *Same*, 3 Ohio, 101 ; *State* v. *Town*, Wright's R. 75 ; *Ford* v. *State*, 12 Md. 514 ; *McGee* v. *The State*, 8 Mo. 495 ; *State* v. *Moran*, 7 Clark (Iowa), 236 ; *Tully* v. *People*, 6 Mich. 273.

We are, therefore, constrained, both from principle and authority, to come to the conclusion that the question proposed must be answered in the negative. CHARLES DANFORTH.

C. W. WALTON.

OPINION OF BARROWS, J., ANSWERING THE QUESTION IN THE
NEGATIVE.

To the question addressed to me by the governor and council, under date of Nov. 1, 1870, as to the construction and effect of the verdict of the jury in the case of Howard A. Cleveland, indicted for murder in Penobscot county, I answer:

It is charged in the indictment that Cleveland did "feloniously, willfully, and of his malice aforethought," kill and murder Warren George. The verdict affirms that he is "guilty of the murder whereof he stands indicted."

In the R. S., c. 118, § 1, it is declared, that "murder is the unlawful killing of a human being with malice aforethought, either express or implied."

Sections two and three of the same chapter define different degrees of this crime, and impose different penalties according to the degree.

By § 2, it appears that when murder is committed with express malice aforethought, or in perpetrating or attempting to perpetrate a crime punishable by death, imprisonment for life, or for an unlimited term of years, it shall be deemed murder of the first degree. Murder otherwise committed, according to § 3, shall be deemed murder of the second degree.

By § 4, it is made the duty of the jury, finding a person guilty of murder, to find whether he is guilty of murder in the first or second degree; and when a person is found guilty of murder by confession in open court, the court is required to determine from testimony the degree of murder, and to sentence accordingly. What will suffice as to the form of indictment is elsewhere presented by statute. Laws of 1865, c. 329.

It is not essential that the specific matters which constitute the distinction between the different degrees of the crime should be stated in the indictment. But this being omitted, and the crime being charged in a manner which includes and is applicable to both degrees, we are not at liberty to dispense with these other positive requirements of the statute. The very fact of such omission would seem of itself to create a more stringent necessity that these re_

quirements should be carefully observed in order to prevent all danger of fatal injustice.

I find nothing in the indictment or verdict here which makes it certain that this murder was committed with the premeditated murderous intention towards the individual slain which would constitute express malice aforethought, or that it was done in perpetrating, or attempting to perpetrate either of the crimes referred to in § 2.

The indictment does not set out a killing with express malice aforethought, nor is there any averment that the murder was committed in perpetrating or attempting to perpetrate any other crime whatever. It charges murder, committed willfully, feloniously, and with malice aforethought, but whether that malice was express or implied does not appear. Malice of either kind would make it murder; but it is only murder committed with express malice aforethought, or in the perpetration, or attempted perpetration of certain other crimes, that is to be deemed murder of the first degree, and punished with death. If Cleveland had pleaded guilty to this indictment, it would still have been necessary for the court to determine from testimony the degree of the crime before passing sentence, and to award sentence according to that determination.

The verdict affirms the guilt of the prisoner no more decisively than a plea of guilty would have done ; and it would seem that the jury wholly omitted to find whether this murder was of the first or second degree. Without an express finding by the jury upon the testimony, in cases where the accused pleads not guilty and puts himself upon trial, or by the court from testimony produced, where he pleads guilty, I am of the opinion that the party charged cannot, upon an indictment like this, under our statute provisions be adjudged guilty of murder of the first degree.

I cannot doubt that our legislature designed, in § 4, to require a specific finding upon the testimony adduced, by the jury, where the prisoner puts himself upon the country, by the court, where he confesses himself guilty as charged in the indictment, of the degree of the crime in order to make it certain that the attention of the tribunal called upon to pronounce a decision so momentous had been directed to the distinction set forth in the statute.

I do not think that a general verdict of guilty of the murder whereof he stands indicted is equivalent to this. In such a case nothing is to be left to inference or argument. The finding must be explicit and unequivocally expressed.

Accordingly, I answer the question propounded by your excellency and the council in the negative.

WILLIAM G. BARROWS.

## OPINION OF DICKERSON, J., ANSWERING THE QUESTION IN THE NEGATIVE.

BELFAST, Dec. 7, 1870.

*To the Honorable, the Executive Council of the State of Maine:*

GENTLEMEN,—I herewith submit my answer to the question propounded by you, whether the jury, by their verdict, finding Howard A. Cleveland " guilty of the murder whereof he stands indicted," found him guilty of murder in the first degree.

In this State murder is of two degrees, murder of the first degree, and murder of the second degree. Murder of the first degree is punishable with death, and murder of the second degree by imprisonment for life. The question calls for the construction of the following provision of the statute:

" The jury, finding a person guilty of murder, shall find whether he is guilty of murder of the first or second degree. When a person is found guilty of murder by confession in open court, the court, from testimony, shall determine the degree of murder and sentence accordingly." R. S., c. 118, § 4.

Under an indictment for murder of the first degree, it is competent for the jury to find the accused guilty of either of the degrees of murder or of manslaughter. So in other cases, two or more offenses may be embraced in the greater offense charged in the indictment, as that includes the lesser offense. Thus, under an indictment for an assault with intent to kill, the prisoner may be convicted of an assault. In such cases, where murder is not charged, a general verdict of guilty is a finding of guilty of the greater offense, but if the jury find the prisoner guilty of a lesser offense, they say so in their verdict.

It is to be observed, however, that there is no such statutory provision, prescribing the course of proceeding in such cases, as there is in the case of murder. No legitimate argument, therefore, can be drawn from them for dispensing with the finding of the degree of murder, when the jury find a person guilty of that offense.

The provision of the statute above cited proceeds upon the hypothesis that a person may be convicted of either of the degrees of murder under an indictment charging murder of the first degree. If under such an indictment the jury could find the prisoner guilty of murder of the first degree only, there would be no occasion for such provision, as the degree would necessarily be implied in the general verdict of guilty.

The object of the statute is to enable the court to know of a certainty the degree of the murder the prisoner has been found guilty of by the jury, that it may pronounce the proper sentence. How can the court know this but from the special finding of the jury? It cannot presume what degree of murder the jury intended by their general verdict, when they might have intended either degree; nothing can be presumed against a prisoner, in capital cases, and the legal presumption of innocence would require judgment to be rendered for the lesser offense when the degree is left uncertain and indeterminate. The degree of the murder committed determines the penalty incurred; upon it hangs the issue of life or death with the prisoner. This, under the statute, is a fact to be found by the jury, as any other fact. "The jury," says the statute, "shall find whether the prisoner is guily of murder in the first or second degree."

This construction of the statute is confirmed by that clause of the same section which requires the court to determine the degree of murder from testimony when a person is found guilty of murder by confession in open court. A plea of guilty, made in open court, has the same effect as a verdict of guilty. How, then, can the court pronounce sentence upon a verdict of guilty, and not upon a plea of guilty?

It can, judicially, have no more knowledge of what the jury intended by their verdict, than of what the prisoner meant by his

plea. By what authority, then, can the court dispense with the finding of the degree in the one case and not in the other?

I do not attach any special importance to the particular form of the verdict under consideration, " guilty of the murder whereof he stands indicted." The words following the general verdict, " guilty," have no legal effect to explain, limit, or qualify the verdict, and may be regarded as surplusage. These words do not come from the jury, but are added by the clerk in recording the verdict. The verdict, in its present form, must be regarded as a verdict of " guilty," nothing more, nothing less. Of what offense, pray, can a jury convict a prisoner, save the offense " whereof he stands indicted?" There can be no difference between the two forms.

But it may be said that the prisoner was indicted for murder in the first degree, and the jury having found him guilty of the murder whereof he stood indicted, consequently convicted him of murder of the first degree.

To this I answer,

1. That the indictment does not set forth the degree of the murder by name.

2. That if the indictment charges murder of the first degree technically, it technically charges murder of the second degree also ; the greater includes the lesser offense ; under this indictment the prisoner might have been convicted of murder of the second degree, and no person can be convicted of such an offense whereof he does not stand indicted. It would be erroneous for the court to hold that the prisoner could not be convicted of murder of the second degree, under this indictment, because he does not stand indicted for that offense.

3. The statute is imperative that " the jury shall find the degree of the murder ;" and

4. The jury have not found the degree of the murder, and neither the court nor the executive council have the requisite legal knowledge to be able to say that the jury, by their verdict, found Howard A. Cleveland guilty of murder of the first degree, and not of murder of the second degree.

*Non constat* that the jury were instructed upon the subject of the

different degrees of murder, or that they took that into the account in considering their verdict, and nothing is to be presumed against the prisoner, when his life is suspended on the issue. If, upon rendering their verdict, the jury had been asked to give the degree of the murder, for aught that appears, they might have answered, " murder in the first degree," or " murder in the second degree," or " our attention has not been called to that question ; we do not understand the different degrees of murder." " We answer," " guilty of murder."

This question has arisen in Ohio, Maryland, Iowa, Missouri, Michigan, Connecticut, and Pennsylvania, under statutes identical with that of our own State, and the courts of those States have invariably held that the jury must find the degree of the murder specially, or it will be error.

I am aware that in *White* v. *Commonwealth*, 6 Binney, Penn., decided in 1813, Chief Justice Tilgham threw out the dictum " that if the indictment were so drawn as plainly to show that the murder was of the first or second degree, all that the jury need do would be to find the prisoner guilty in manner and form, as he stands indicted." The question before the court in that case was, not whether the jury should specially find the degree of murder, but whether the degree of the murder should be set forth in the indictment. The case did not call for the remark of Chief Justice Tilgham; and it has been universally treated as a dictum, not only by the courts in other States but by the court in Pennsylvania in more recent cases. Accordingly it was held in *Johnson* v. *The Commonwealth*, 25 Penn. (decided in 1855), under a statute requiring the jury to find the degree of the murder, that in an indictment charging the killing by drowning, a verdict of " guilty in manner and form as the prisoner stands charged " is not a conviction of murder in the first degree. In that case the sentence of death was reversed and annulled on error, because the jury did not find the degree of the murder and the record remitted to the court to pass such sentence as was authorized for conviction of murder in the second degree.

In *Commonwealth* v. *Earle*, 1 Whart. 525 (1836), on an indictment for murder perpetrated by means of poison, a verdict of

" guilty in manner and form as stated in the indictment," was held to be a good conviction of murder in the first degree, on the ground, as stated by the court, that by a statute of Pennsylvania, murder by poisoning was made murder of the first degree, and that there was no room for doubt as to the degree; if guilty, the prisoner must necessarily be guilty of murder in the first degree. " The provision," say the court in that case, " for ascertainment of the degree by verdict, was intended for cases in which the jury might be at liberty to find the prisoner guilty in the second degree, but as in cases of murder by poisoning the prisoner is guilty, if at all, in the first degree, and as a verdict of guilty in another degree would not be received, the law will not require, though it might endure, the performance of an act so nugatory as an attempt at classification where there is no difference, or the making by verdict of a measure of guilt preëstablished by the law itself."

During my examination of this question, I have been unable to find a case where, under a similar statute, a verdict, like the one under consideration and rendered under like circumstances, has been held sufficient to warrant a sentence for murder of the first degree.

The cases of *Kennedy* v. *The State*, 6 Porter, Ind. 485; *Fitzgerald* v. *The People*, 37 N. Y. 413; and *Kennedy* v. *The People*, 39 N. Y. 249, are not of this description, as they were not decided under any statute requiring the jury to find the degree of the murder. To make these cases authority for sustaining the sentence on the verdict under consideration, seems to me to render the statute nugatory in this State; or, in other words, to make the finding under consideration valid as a verdict for murder in the first degree in spite of the statute, because it might be valid if there were no such statute.

I am, therefore, compelled to answer the question propounded in the negative.                              Yours, faithfully,

                                         J. G. DICKERSON.

*To the Governor and Executive Council of the State of Maine.*

In pursuance of the foregoing proceedings, I herewith communicate my answer to the interrogatory propounded.

Murder is in this State defined by statute, and declared to be the unlawful killing of a human being with malice aforethought, either express or implied. R. S., c. 118, § 1.

This murder is divided into two degrees. " When murder is committed with express malice aforethought, or in perpetrating or attempting to perpetrate a crime punishable by death, imprisonment for life, or for an unlimited term of years, it shall be deemed murder of the first degree, and punished with death." R. S., § 2 of same chapter.

" When murder is committed otherwise than is set forth in the preceding section, it shall be deemed murder in the second degree, and punished by imprisonment for life." Same statute, § 3.

To constitute murder, the act must be done with malice aforethought. This may be an express malice or an implied malice.

If the act is done with express malice, it is of the first degree ; if done with implied malice, and not in perpetrating or attempting to perpetrate any other offense, it is of the second degree. So it will be perceived, that whether of the first or the second degree depends upon the fact whether it was done with express malice, or implied malice, unless it was done in perpetrating or attempting to perpetrate another offense.

The indictment charges murder generally, viz., an unlawful killing with malice aforethought. It does not charge the act to have been done with express malice, or in attempting to perpetrate any other offense, nor was this necessary to be done to authorize a judgment upon a finding of murder in the first degree. The indictment as framed embraces murder in either degree. The degree is to be ascertained from the evidence. The statute requires a jury, finding a person guilty of murder, to also find whether he is guilty of murder in the first or second degree (§ 4), because simply finding him guilty of murder, does not determine whether it is of the first or of

the second degree, and the court cannot know without such finding whether to inflict the punishment of death, or that of imprisonment for life.

If the indictment embraced only murder in the first degree, there would be no need of the requirement that the jury should also find the degree, because a finding of guilty under it would also determine the degree; but where the indictment embraces both degrees, some mode must be pursued to ascertain the degree. That mode has been provided by the legislature, but was not pursued in this case so far as appears by the record transmitted to me.

From this record it appears that the jury simply found " that the said Howard A. Cleveland 'is guilty of the murder whereof he stands indicted.' "

Inasmuch as he stood indicted for murder generally, either of the first or second degree, as the evidence should prove, this verdict finds him guilty of murder in the second degree as much as it does in the first degree. There is nothing in it to show that it was of the first, and not of the second degree. The jury are the only competent tribunal to determine the question of degree, and they have not determined in this case that it was of the first degree. I therefore answer in the negative. RUFUS P. TAPLEY.

---

## STATE OF MAINE.

HOUSE OF REPRESENTATIVES, ⎱
Jan. 23, 1871. ⎰

*Ordered,* That the justices of the supreme judicial court be requested to furnish the house with their opinions upon the following questions:

Has the legislature authority under the constitution to pass laws enabling towns, by gifts of money or loans of bonds, to assist individuals or corporations to establish or carry on manufacturing of various kinds, within or without the limits of said towns? And if towns thus authorized may assist private parties, may they go

further and establish manufactories entirely on their own account, and run them by the ordinary town officers or otherwise?

BANGOR, Feb. 10, 1871.

*To the House of Representatives of the State of Maine :*

To the questions proposed by the legislature, we have the honor to answer as follows :

1. "Has the legislature authority under the constitution to pass laws enabling towns, by gifts of money . . . to assist individuals or corporations to establish or carry on manufacturing of various kinds, within or without the limits of said towns?"

As the proposed gifts can only be raised by taxation, the question really is, can the legislature constitutionally authorize towns to assess taxes upon their inhabitants and collect the same, for the purpose of giving the proceeds to some favored manufacturer or manufacturing corporation. And as some of the inhabitants may be indisposed to such generosity, the inquiry will arise, whether the legislature can authorize the majority by vote to give away the estates of the minority or any portions thereof, not merely without but against their consent?

Taxation, by the very meaning of the word, is for public purposes, and for those the right of the government to impose taxes is unlimited. Taxes are the enforced proportional contribution of each citizen and of his estate, levied by the authority of the State for the support of government and for all public needs. They are the property of the citizen, taken from the citizen by the government, and they are to be disposed of by it. The necessities of government are more or less extensive according to the greater or lesser extent of governmental interference. Taxation originates from and is imposed by the State. The proceeds are for the government to enable it to carry into effect its mandates and to discharge its manifold functions.

The line of demarcation may not always be clear and distinct, and well defined between what is for public and governmental, and what for private purposes,—between the general legislation for the whole people and the special for the individual. But the questions proposed leave no doubt as to the special phase of legislation to

which they refer. They are obviously limited by and embrace what is special and private, excluding by their very terms whatever may or can by the most enlarged and liberal construction be regarded as relating to municipal, governmental, or public objects of any description whatsoever.

Individuals and corporations embark in manufactures for the purposes of personal and corporate gain. Their purposes and objects are precisely the same as those of the farmer, the mechanic, or the day laborer. They engage in the selected branch of manufactures for the purpose and with the hope and expectation, not of loss, but of profit. By the very assumption of the interrogatory, they are engaged in private and corporate undertakings for private and corporate emolument. All municipal, police, educational, public, or governmental purpose, whether of peace or of war, is excluded from our consideration by the manifest purport of the inquiry.

Capital naturally gravitates to the best investment. If a particular place or a special kind of manufacture promises large returns, the capitalist will be little likely to hesitate in selecting the place and in determining upon the manufacture. But whatever is done, whether by the individual or the corporation, it is done with the same hope and expectation with which the farmer plows his fields and sows his grain,—the anticipated returns.

Now the individual or corporate manufacturing will in the outset promise to be, and in the result will be, either a judicious and gainful undertaking, or an injudicious and losing one. If the manufacturing be gainful, there seems to be no public purpose to be accomplished by assessing a tax on reluctant citizens and coercing its collection to swell the gains of successful enterprise. If the business be a losing one, it is not readily perceived what public or governmental purpose is attained by taxing those who would have received no share of the profits, to pay for the loss of an unprosperous manufacturer, whether arising from folly, incapacity, or other cause. The tax-payer should not be compelled to pay for the loss when he is denied a share of the profit.

It is true the inquiry is, whether the legislature can authorize a town by a major or any vote to give away the property of an unwilling minority to an individual or manufacturing corporation

whom or which such majority may select as donees. The question relates only to manufactures; but if the right of confiscating the private property of individuals for the purpose of giving it away to one branch of industry can be conferred upon towns, one does not easily see when or what bounds can be imposed or limitations made.

The general benefit to the community resulting from every description of well-directed labor is of the same character, whatever may be the branch of industry upon which it is expended. All useful laborers, no matter what the field of labor, serve the State by increasing the aggregate of its products,—its wealth. There is nothing of a public nature any more entitling the manufacturer to public gifts than the sailor, the mechanic, the lumberman, or the farmer. Our government is based upon equality of rights. All honest employments are honorable. The State cannot rightfully discriminate among occupations, for a discrimination in favor of one branch of industry is a discrimination adverse to all other branches. The State is equally to protect all, giving no undue advantages or special and exclusive preferences to any.

The constitution provides that "private property shall not be taken for public uses without just compensation, nor unless the public exigencies require it." But here the question is, whether private property can be taken for private purposes without just or any compensation. No public exigency can require private spoliation for the private benefits of favored individuals. If the citizen is protected in his property by the constitution against the public, much more is he against private rapacity. If the public cannot take private property against the consent of the owner without just compensation, and only when it is required by some public exigency, most assuredly private property cannot be taken for private purposes without just or any compensation, and when it is not needed to meet any public exigency.

If it were proposed to pass an act enabling the inhabitants of the several towns by vote to transfer the farms or the horses or oxen, or a part thereof, from the rightful owner or owners to some manufacturer whom the majority might select, the monstrousness of such proposed legislation would be transparent. But the mode by which

property would be taken from one or many and given to another or others can make no difference in the underlying principle. It is the taking that constitutes the wrong, no matter how taken. Whether the cow or ox be taken from the unwilling owner and given to a manufacturer, or the gift be of the money obtained by a sale made by the collector, or by the payment of the tax to avoid such sale, does not and cannot change the principle. In either case the cow or the ox, or the value thereof, is taken from the owner, and is given away by others without the owner's consent. If a part of one's estate may be given away, another and another portion may upon the same principle be given away, until all is gone. What is this but manifest and undisguised spoliation?

The farmer and the mechanic may as well be donees as the manufacturer, and they alike equally labor for the general benefit in laboring for themselves. If a tax were to be assessed upon estates to be redistributed *per capita*, it would be plain spoliation. Is it any better, any the less spoliation because the gift is to one man or to one corporation rather than to all the inhabitants?

The legislature by the constitution are empowered "to make and establish all reasonable laws and regulations for the defense and benefit of the people of this State, not repugnant to this constitution, nor to that of the United States."

By the declaration of rights, "all men . . . have certain natural, inherent, and unalienable rights, among which are those of acquiring, possessing, and protecting property," etc. But what inducement is there to acquire property, if the tenure of the acquisition is the will of others? How can one possess and protect property if the legislature can enable a majority to transfer by gift, through the medium of direct taxation for that end, such portions or the whole of one's estate as it may deem expedient? Such a law may be for the benefit of the donee, but it cannot be for that of the people. Grant this power to the legislature and let it be exercised, and all security for property is at an end. The motive to acquire is destroyed. The enjoyment of possession is taken away. The power to protect is gone.

The constitution provides, that no person shall "be deprived of his life, liberty, property, or privileges, but by judgment of his peers

or the law of the land." Property taken by taxation is not taken by the judgment of our peers. A statute in direct violation of the primary principles of justice is not "the law of the land" within the meaning of the constitution. Every citizen holds life, liberty, and property by the law and under its protection. Every enactment is not of itself and necessarily a law or the law of the land. Such is not a statute passed for the very purpose of working a wrong and in violation of the constitution. To declare it to be so would render this part of the constitution nugatory and nonsensical. The phrase is one adopted from Magna Charta. "As to the words from Magna Charta," observes Mr. Justice Johnson in *Bank of Columbia* v. *Oakley*, 4 Wheat. 235, . . . "after volumes spoken and written with a view to their exposition, the good sense of mankind has at length settled down to this, that they were intended to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private right and distributive justice."

The objects for which money can rightfully be raised must be such as conduce to the public interest, and are for the well being of the people. The true principle is thus stated by the supreme court of Pennsylvania in the case of *Sharpless* v. *Mayor*, 21 Penn. 168, in which the right of taxation to aid railroads was affirmed: "The legislature has no constitutional right to . . . levy a tax or to authorize any municipal corporation to do it, in order to raise funds for any private purpose. No such authority passed to the assembly by any grant of the legislative power. This would not be legislation. Taxation is a mode of raising revenue for public purposes. When it is prostituted to objects in no way connected with the public interest in welfare, it ceases to be taxation and becomes plunder. Transferring money from the owners of it into the possession of those who have no title to it, though it be done under the name and form of a tax, is unconstitutional for all the reasons which forbid the legislature to usurp any other power not granted to them." These views as to the right of imposing taxes seem to have received the sanction of the different courts in which the question has arisen. It would be simply an act of despotic power to sequestrate the property of an individual or individuals directly or indirectly by

the means of taxation, for the purpose of giving it away against the will of the owner, and to those whom others than he may select.

2. Has the legislature authority under the constitution to pass laws enabling towns, by . . . loans of bonds, to assist individuals or corporations to establish or carry on manufacturing of various kinds, within or without the limits of said town?

As the bonds of the town should be paid at maturity, and the payment must be met by taxation for that purpose, the issuing of the bonds or the raising of the money in the first instance for the objects contemplated present one and the same question.

The inquiry is of the same character and involves the same considerations as the one already discussed. True, the money is not given, and there is a remote and possible contingency of ultimate repayment. But towns are not banking corporations. The issuing of bonds or the raising of money by taxation for the purpose of assisting individual or corporate enterprise, whether in manufacturing within or without the town, is the simply fostering individual and private enterprise. It may be taking one's money without his consent, to be loaned to an individual whom its owner would not trust, for a time which might be inconvenient, for a purpose which he might deem injudicious, and at a rate of interest at which he would decline lending to any one. All security of private rights, all protection to property, is at an end when one's money may be taken to be given away or loaned without his permission and at the will of others. It is no answer that the loan may be repaid. It is the owner's money, and its protection is guaranteed to him by the constitution, subject only to the higher rights and needs of the State.

3. May towns "establish manufactories entirely on their own account, and run them by the ordinary town officers or otherwise?"

Towns were a part of the political organization of New England long before the formation of the constitution of this State. They are created by the government for specific purposes. They are a part of it. They are among its most efficient instrumentalities in carrying out successfully the objects of its very existence. Through their agencies the taxes required for the needs of the State are raised. Extensive powers are conferred on these corporations,—but

they are public corporations for public purposes. They may purchase or build town-houses, where the meetings of the inhabitants are to be held; school-houses, where the youth are to receive instruction; poor-houses, where the pauper is to be supported; police stations, where the criminal may be temporarily restrained,—for these are among the recognized functions of government. So, in case of insurrection or war, they may coöperate with the general government in suppressing the one or in bringing the other to a successful termination. These are only among the illustrations of the exercise of corporate powers and duties. Towns are public corporations, created and existing only for public purposes, not private corporations for the purposes of traffic or manufacturing.

The entering into contract is a consensual act. The formation of a partnership is a contract. The consent of the partners is necessary thereto. The legislature could not, by any statute, compel individuals without their consent to be partners and to assume the liabilities of partnership, and give the control of the funds to those who do not, and take it from those who do furnish the capital. But giving the town authority to establish manufactories is thus coercing a partnership. It is despotically taking the control of capital from its owners and transferring it to others. It is enabling the majority of a town to incur unlimited indebtedness. If the towns can embark in manufacturing, they can create a partnership, by which all the property of the inhabitants is pledged to meet the contingencies of business. If they can embark in manufacturing, why not in mercantile pursuits of any and every description? What conceivable limits are there to the spirit of reckless speculation, especially when those without means may have the power to dispose of and control the estates of those who have?

Capital is the result of foresight, intelligence, and frugality. It is not created by the issuing of bonds or the giving of notes. It is the fruit of saving. Men only save when protected in the enjoyment of their accumulations. When not so protected, one of the strongest motives to save ceases, and with the cessation of the motive, the accumulation of capital ceases. When the government is despotic, when private right is disregarded, when there is no security for and no protection of property, men will cease to accumulate, for they will not save to be robbed.

If it were the special object to lessen industry, to diminish capital and to prevent its increase, the most sure and effective mode to accomplish the result,—there could be none more so,—would be to withdraw the control of capital from its owners and to transfer its management to others, thus creating the greatest possible insecurity. The more numerous the body of men controlling its use and employment, the greater the chances of mismanagement, fraud, waste, and consequent loss. /The less the State interferes with industry, the less it directs and selects the channels of enterprise, the better. There is no safer rule than to leave to individuals the management of their own affairs. Every individual knows best where to direct his labor, every capitalist where to invest his capital. If it were not so, as a general rule, guardians should be appointed, and who would guard the guardians?

To give the power suggested would be to enable the majority, according to their own will and pleasure, to give, lend, and invest the capital of others, and to the extent of the power exercised, it would be to deprive the owners of the ability to give, lend, or invest their own funds. Let this be done, and the remaining rights of property would be hardly worth the preserving.

To do this, would be to impair or take away the inherent and unalienable right of "acquiring, possessing, and protecting property;" to deprive men of their property neither "by the judgment of their peers" nor "by the law of the land;" to take private property, not for public but for private uses, without compensation, and to undermine the very foundations upon which all good governments rest.

We, therefore, answer the questions proposed in the negative.

JOHN APPLETON,

C. W. WALTON,

CHARLES DANFORTH.

Regarding the question submitted to be substantially this, Can the legislature authorize towns, by gifts of money or loan of bonds, to aid purely private enterprises, in nowise connected with the public use or public exigencies? we answer in the negative.

EDWARD KENT,

RUFUS P. TAPLEY.

*To the House of Representatives:*

In answer to your request I have the honor to remark, that I concur in the opinion drawn by Chief Justice Appleton, provided his conclusions are drawn from premises rightfully assumed,—which are, whether the legislature can constitutionally authorize towns to assist individuals or corporations to carry on individual enterprises for their own private benefit without regard to any public advantage.

If your inquiries were so restricted and limited, then it may be questionable whether that " solemn occasion " has occurred which would require an opinion from this court; for I apprehend that no member, worthy of a seat in your house, would for a moment hesitate to answer the inquiries in the negative.

Yet I apprehend (although doubtingly) that your questions were intended to include such legislation as would embrace the public interest. If so, they would include the past as well as the future enactments. We should not be required to settle by solemn decision constitutional questions, *ex parte*, where millions of dollars are involved, in the absence of the parties directly interested; and in cases, too, where no complaint has ever been made to us by any party directly or indirectly concerned.

Ordinarily, courts are required to pass upon the constitutionality of acts already passed; if called upon before that time to express an opinion, they either become *quasi* lobby members, or a component part of the legislature, thereby abolishing one independent and coördinate branch of the government.

In conclusion, and in answer to your inquiries, so construed as I have intimated, I reply, that I shall consider all special or private acts to be constitutional, which have passed the ordeal of the house and senate, been approved by the governor, and accepted by the corporation assumed to be benefited thereby, and which the legislature considered to be of public advantage, until an aggrieved party in a court of law or equity appears and shows to the contrary.

Respectfully, etc.,

JONAS CUTTING.

*To the Honorable Speaker of the House of Representatives of the State of Maine:*

I have the honor herewith to transmit my answers to the interrogatories propounded to me, as one of the justices of the supreme judicial court, by an order of the house of representatives, passed Jan. 25, 1871.

The duty of expounding the constitution of the State is the most delicate and important one that the constitution devolves upon the justices of this court. The gravity of this duty, and the responsibility for its intelligent, upright, and independent performance are, perhaps, on no occasion more conspicuous than when the members of the court are solemnly called upon to pronounce, beforehand, upon the authority of an equal, coördinate, and independent branch. of the government, under the constitution. While the momentous nature of such an occasion makes this duty by no means less imperative, it oftentimes renders it far more difficult of performance, by intensifying the necessity for a more careful analysis of the principles of interpretation, and a more thorough scrutiny of the authorities.

It was, therefore, with unaffected diffidence that ·I approached the consideration of the interrogatories propounded; and whatever estimate may be put upon the correctness of the conclusions to which I have arrived, I am conscious that they are not formed without deliberate consideration, and are such as reason, authority, and a proper regard for the public welfare compelled me to adopt.

It is to be observed, at the outset, that there is a marked distinction between the legislative authority of the national government, and that of the State government, resulting from the distinctive nature of the two governments. The national government being one of derivative and limited powers, congress can only exercise those powers that are conferred upon it by the constitution. On the other hand, the State government, representing the sovereignty of the people, the State legislature possesses all powers of a strictly legislative character which reside either in the State or the people, not limited or restricted in the State or national constitutions. With these qualifications, the legislative functions of the several State legislatures are as absolutely unlimited as those of the British

parliament. Hence the legislative powers of the respective State legislatures differ according to their several State constitutions; and before the decision of any State court, in regard to the constitutionality of an act of the legislature thereof, is receivable as authority for a like statute in another State, it is necessary first to ascertain whether the grant of legislative authority in the two States is the same.

The restrictions upon the authority of the legislature in this State are three-fold. 1. A law must be " reasonable." 2. It must be " for the defense or benefit of the people of this State." 3. It must not be repugnant to the constitution of this State or that of the United States. Con., Art. 4, Part 3, § 1.

Whether a proposed enactment is reasonable or not, in the purview of the constitution, is a question primarily addressed to the sound discretion and intelligent judgment of the legislature; and in general its decision of that question is conclusive. While there are exceptions to this proposition, they are not among the probabilities of legislation, and must be of an extraordinary character to warrant the interference of the judiciary. But when there is a clear excess or abuse of legislative authority, in this respect, the court will not abdicate its prerogative, but will interpose its constitutional right to check or control it.

Whether a law is " for the benefit of the people of this State," in the sense of that word when the sovereign power of taxation is to be invoked for its accomplishment, is, perhaps, a question more difficult of solution. This language is broad and comprehensive, and is to be construed in no narrow or illiberal sense, but in a manner that shall enable the legislature to take enlarged views of State policy, State interests and necessities, to employ the public revenues to give effect to these views, and authorize towns and cities to fulfill the legitimate purposes of their organization by taxation or otherwise.

The benefit sought may be preventive or remedial, moral or sanitary, pecuniary or educational, but the purpose of the law that involves the necessity of taxation must be public. This is the intendment of the constitution, as well as the essence of the meaning of the word taxation, which has for its only legitimate object the

raising of money for public purposes and the proper needs of government. The contemplated benefit may not reach to all parts of the State; it may be local in its character, applying to the people within certain specified territorial limits, who may reasonably be expected to derive some peculiar or special advantage or benefit from a proposed legislation, or work of public convenience and necessity which will not be enjoyed to the same degree by other portions of the State.

Such are the laws providing for the survey of lumber, the inspection of lime, hay, and other articles, the taking of fish in certain waters, the establishment of local tribunals, sanitary and police regulations, public parks and public libraries, the making of roads and bridges, the building of drains and aqueducts, the support of the poor, the widening of streets, the supplying of gas or water to towns or cities, and the erection of public halls and public institutions of learning. It is not the purpose of these laws to confer pecuniary benefit upon private individuals, or increase the value of private property, or furnish employment for the people, in a particular district, but it is to subserve the public convenience and promote the general welfare. The benefits, too, of such laws may be accessible, in general, to all who reside in the territorial limits to which they apply. They are public laws in their design, purpose, mode of application, and effect; and, for the most part, meet wants which private enterprises cannot supply. These laws, too, are administered by officers appointed by State authority, or elected by the local constituencies. Laws of this description have for a long period been enacted by the wisest legislators, upheld by the most learned courts, and sanctioned by the most eminent statesmen of the land.

There is, however, a broad and well-defined distinction between the purpose to be subserved by these laws and the purpose of "laws enabling towns, by gifts of money or loans of bonds, to assist individuals or corporations to carry on manufacturing."

The direct purpose of the laws I have been considering is public. How is it with the law proposed? The argument in support of the constitutionality of such a law is, that the establishment of the business of manufacturing in a town or city promotes the public

APPENDIX. 603

prosperity, by increasing the value of private property, inviting in capital and population, and furnishing employment for the people. The direct purpose of the proposed law is thus private in its character; it is to increase the means and improve the property of some, and furnish employment to some, while the benefit, if any, to the public is only reflective, incidental, or secondary. Can a tax be constitutionally imposed by municipal corporations to load the tables of the few with bounty that the many may partake of the crumbs that fall therefrom?

Another argument in favor of such legislation is that certain existing local enterprises will not be self-supporting, and that certain others will not be established, if such compulsory aid is not furnished,—an argument in conflict with the theory that a business that cannot stand alone might as well not stand at all, and that the law of demand and supply is the safest regulator of business. But does the inability of A., to carry on or establish manufacturing, afford any constitutional ground for taxing B. to help A. do so? Besides, what guaranty is there that A.'s business will be self-supporting with one installment of B.'s property, and that he may not call for another, and yet another? And what claim has manufacturing to such preference over other branches of industry, commerce, trade, agriculture, and the mechanic arts? These are honorable and beneficial pursuits, and the constitution of this State will be searched in vain to find any powers given to the legislature to authorize towns and cities to discriminate against these employments and in favor of manufacturing, in the matter of taxation. If municipal corporations may assess a tax upon their citizens by authority of law, to encourage one, it may each and all the branches of necessary industry; and the question is reduced to this, Has the legislature the constitutional authority to authorize the towns and cities in this State to tax their inhabitants for the purpose of aiding, establishing, or carrying on, not only manufacturing, properly so called, but also farming, ship-building, trading, inn-keeping, printing, banking, insurance, and any other branch of beneficial industry?

The fact that such legislation is of recent origin is, at least, calculated to cast doubt upon its constitutionality; and it is so in-

consistent, too, with the common-law doctrine of the purposes, powers, and duties of municipal corporations, the generally conceived notions of legislative authority, and of the inviolability of the right of private property, that the statement of this question almost instinctively elicits a negative answer. The object sought by this legislation is confessedly to be accomplished by municipal taxation. The tax, when collected and bestowed upon the favored individual or corporation, becomes at once the private property of the recipient. Henceforth it is such party's to use, control, and dispose of. If this may be done, what becomes of the freedom of industry and the security of private property? If the legislature may authorize towns and cities to raise a thousand dollars for such purpose, by taxation, it may an indefinite sum, limited only by its own discretion, and the will, cupidity, or caprice of the required majority of the municipality. Under such legislation, what citizen can, of a truth, say, " My property is my own, to use, control, and dispose of at pleasure, and is not subject to the paramount right of my neighbors, to devest me of, and bestow upon another, or appropriate to their own benefit ? " To exact such a tax is to compel A. to pay a bounty to B., for B.'s private benefit, on the ground that B.'s use of it may secondarily result in some indefinite benefit to A. Such a tax lacks the distinguishing characteristic of legitimate taxation,— a public purpose. By inhibiting the taking of private property for public use, without just compensation to the owner, and then only when the public exigencies require it, the constitution impliedly prohibits the taking of private property for private use. The tax in question violates the rights of private property. It is a tax for private purposes, and, therefore, invalid,—an illegal exaction, under another name, and clearly repugnant to the constitution.

The class of cases under consideration differs in principle materially from those where towns and cities are authorized by the legislature to aid railroad enterprises by loan of their credit or subscription to the stock of railroad corporations. The constitutionality of such legislation has for a long time been sustained by the court in this State and by the courts in more than twenty other States, and their decisions have been approved by the supreme court of the United States, that court having repeatedly held that the inhibition

against taking private property for public purposes, without compensation, contained in the constitution of the United States, does not extend to State legislation, but is restricted to the legislation of congress, and that it is the exclusive right of State courts to de-determine the constitutionality of State laws, when they are not repugnant to the constitution of the United States, or the constitutional enactments of congress.

The reason for the distinction between these two classes of cases is obvious. Railroads are manifestly the great public convenience, and necessary not on the ground that they incidentally serve to develop the resources of the country, and increase the local value of private property in the municipalities through which they pass, or at which they terminate, but because they primarily and directly afford the necessary facilities to the public for intercommunication between remote sections of the country as public highways, which, in general, can only be furnished through the exercise of the right of eminent domain. The primary purpose of railroads is thus a public one, and on this ground the courts of the several States have held, with singular unanimity, that it is competent for the State legislatures to authorize railroad corporations to exercise the right of eminent domain over the private property needed for their use. It is only on the ground that the purpose of railroad corporations is public, that the constitutionality of such legislation has been upheld, or that it can be maintained. The enhancement of local values and the development of local resources, the multiplied demand for labor and the increase and concentration of capital and population, brought about by the instrumentality of railroads, are incidental considerations, and afford no sufficient warrant for conferring upon railroad corporations the right of eminent domain.

Not only is the public character of railroad corporations established by their office, as public highways, and by the grant of the right of eminent domain to them, but it further appears from the various legislative enactments in regard to the construction of these roads, the provisions for the safety of the public, the constant supervision to be exercised over their management by the railroad commissioners of the State, and the penalties imposed for their neglect or violation of these regulations.

I am aware of the recent decisions in some of the western States against the constitutional right of the State legislatures to authorize municipal corporations to loan their credits to, or take stock in railroad corporations. But after the earlier, oft repeated, and, as it seems to me, better considered opinions of the courts of other States, in support of this right, I do not feel at liberty to accept the conclusions of the courts in Iowa, Wisconsin, and Michigan upon this subject. I am, however, disposed to adopt the language of the supreme court in Pennsylvania in *Hammond* v. *City of Philadelphia*, Am. Law Reg. for July, 1869 : " We must say at some time to this tide of special taxation, ' Thus far shalt thou go, and no farther.' To our own decisions, so far as they have gone, we mean to adhere. We are now asked to take a step much in advance of them. This we would not be justified, by the principles of the constitution, in doing."

In discussing the questions propounded, I have not taken into consideration the authority of the legislature to determine conclusively whether a law " is for the benefit of the people of this State," in respect to general matters of legislation, but only where a law requires the exercise of the power of taxation. The power of taxation is a sovereign power; and it has been uniformly held that it is the province of the supreme court in the last resort to decide whether this power has been exercised in derogation of the constitution. Without such authority in the court, it is difficult to see what power it has, under the constitution, to prevent, check, or control the excess or abuse of legislative authority, in respect to matters of the gravest import to the people.

Neither have I, by any means, considered the case of laws designed to meet the public exigencies, when, by some extraordinary calamity, the homes, houses, places and means of business in a town or city have been destroyed, and its inhabitants have thereby been rendered houseless, homeless, and destitute of employment.

I have, therefore, to answer the several interrogatories proposed in the negative.

I have the honor to be, yours, faithfully,

J. G. DICKERSON.

BELFAST, Feb. 13, 1871.

BRUNSWICK, Feb. 10, 1871.

*To the Honorable Speaker and House of Representatives of the State of Maine:*

It is obvious that the scheme of legislation referred to in the questions propounded by you, under date of Jan. 23, 1871, involves, in some of its phases, a necessity for taxation, and, in all the others, a liability to be obliged to resort to it.

We are called upon, therefore, to consider and discuss the constitutional limits of this power of taxation.

I answer the first question in the negative, because—

1. It is against common right, and beyond the legitimate sphere of legislation, to raise, under color of taxation, any sums of money except those which are required to promote the appropriate objects for which the government was instituted. These objects are defined in the preamble to the constitution of our State.

To that constitution, which is the source and origin of the authority which the legislative department may exercise, we must look to ascertain the nature and limitations of the power of legislation in this respect.

The preamble declares, that the people of Maine entered into that compact which lies at the foundation of our government, "in order to establish justice, insure tranquillity, provide for our mutual defense, promote our common welfare, and secure to ourselves and our posterity the blessings of liberty." Any object which cannot be classed under one or other of these heads is beyond the proper scope of legislation. To raise money for the purposes above enumerated is the proper and the only legitimate exercise of the power of taxation.

"The revenues of the State are a portion that each subject gives of his property in order to secure or to have the agreeable enjoyment of the remainder. To fix these revenues in a proper manner, regard should be had both to the necessities of the State and those of the subject. The real wants of the people ought never to give way to the imaginary wants of the State.

"Imaginary wants are those which flow from the passions and from the weakness of the governors, from the charms of an extraordinary project, from the distempered desire of vain-glory, and

from a certain impotency of mind rendering it incapable of withstanding the attacks of fancy. Often has it happened that ministers of a restless disposition have imagined that the wants of their own little and ignoble souls were those of the State."—*Montesquieu, Spirit of Laws*, Book XIII. c. 1.

Here, where all citizens are in a certain sense "governors" and "ministers" as well as "subjects," and projects for legislation looking mainly to private gain and emolument, though well cloaked under specious pretences of regard for the public weal, are as numerous as the locusts in Egypt, these suggestions of the wisdom and prudence of our old days ought to be carefully regarded; and it is especially becoming in our legislators to be cautious not to overstep the constitutional boundaries of their authority, nor to inaugurate a system of legislation, the manifest end and aim of which is to enhance private gain at the public expense.

See now how the whole body of our legislation, during the fifty years that we have existed as a State, ranges itself under one of the heads enumerated in the preamble to the constitution, "to establish justice, insure tranquillity, provide for our mutual defense, promote our common welfare, and secure to ourselves and our posterity the benefits of liberty."

For these purposes taxation is legitimate, and as to some of them, at least, where the power can be more conveniently and intelligently exercised in the primary assemblies of the people, in their town meetings, the power of the legislature to authorize the towns to raise the sums necessary within their own borders, cannot be doubted.

But under which of these heads can projects like those referred to in your interrogatory be classed? Doubtless the specious but deceptive claim of their advocates will be, that they tend to promote the common welfare. But to know for a certainty that that claim cannot be allowed, we have only to look at the definition of the word common when used in such a connection. "Common,— belonging to the public; having no separate owner; general; serving for the use of all,—universal; belonging to all."—*Webster's Dictionary*.

It is to promote the common welfare, as thus defined, that you

have authority to legislate and to raise money by taxation; and you can confer upon towns no delegated authority exceeding this. In fine, it is a principle that lies at the very foundation of all legitimate exercise of the power of taxation that the revenue shall be raised for public purposes alone, and not for private profit and advantage. This alone makes the distinction between lawful taxation and public plunder.

But the subtle and sophistical argument of those who are seeking their own private advantage by the use of the public purse is, that the successful establishment of a manufacturing business, though the profits of it enure to private individuals or corporations, is indirectly a benefit to the community. But this is not an answer; it is simply a pretext for an evasion of the fundamental principle above stated. What is the object of the proposed legislation? There can be but one answer.

It is proposed " to pass laws enabling towns by gifts of money or loans of bonds to assist individuals or corporations to establish or carry on manufacturing of various kinds." The business and its emoluments are to belong to and be controlled by the individuals or corporations to whom these gifts of public money or loans of public credit are to be made. It is obvious that the aid to the individual or corporation is the primary and proximate object of the law, and that the public benefit is incidental and secondary,—too remote to be termed an object of the law, even if it were not also merely contingent upon the skill and good fortune in business of the party to whom the donation is made.

All productive employments honestly carried on are creditable to their projectors, and if prudently managed with due heed to the inexorable laws of demand and supply are likely not only to make ample returns to those having the control of them, but to be incidentally advantageous to the community in which they are located; but it passes the limits of constitutional legislation to make any one of them a pensioner upon the public funds derived from unwilling contributions levied upon the rest in the form of taxes. This violates the cardinal principle that the State shall give all alike the benefit of equal laws without favoritism or partiality.

In testing the constitutionality of a law imposing a public bur-

den, the naked question is, Is the object one of those which the government was instituted to provide for according to the terms of the compact into which the people entered when they formed their constitution, or is it one which by long-settled usage has been left to be fostered by private enterprise, industry, and liberality, because its profits flow directly into the pockets of private individuals or corporations, and the benefit which it confers on the community is only incidental and secondary ?   If it falls within the latter class, it is without the pale of constitutional legislation.

It is the plain legal duty of those who seek a profit for themselves out of the carrying on of a manufacturing employment to furnish the capital or credit necessary to maintain it.   If the undertaking is too great for a single individual, the State stands ready to furnish to all alike the means of combining for the purpose under liberal and equal laws as an association or as a corporation ; but under our constitution as it stands, it is not at liberty to go further and assess the moneys with which the experiment is to be tried upon those who are entitled to no part of the dividends, if any accrue.   In *Freeland* v. *Hastings*, 10 Allen, 570, one of the questions before the supreme court of Massachusetts was, whether it was competent for the legislature to pass a law authorizing towns to reimburse those who had procured substitutes.   Bigelow, chief justice, giving the opinion of the court, remarks as follows : " It is obvious that money paid by an individual to procure a substitute in his stead is not paid primarily or chiefly for a public object, but to purchase a personal exemption from a duty or liability to which he is subject by law."   And he stated the conclusion of the court upon the question in these terms : " We know of no rule or principle on which a valid authority to raise money by taxation, to be appropriated to the repayment of money expended by individuals for such a purpose could be granted by the legislature.   A statute conferring such a power would be obnoxious to the objection that it authorized the raising of money by taxation for the exclusive benefit of particular individuals ; that it relieved one citizen from the performance of a legal duty at the public expense, and appropriated money for a private purpose which could only be raised and used for public objects.   It is hardly necessary to say that a statute designed to accomplish such purposes

would be against common right, and would transcend the authority conferred on the legislature by the constitution."

The law which contemplates the raising of money by taxation to aid individuals or corporations in establishing or carrying on a manufacturing business for their own benefit and behoof, is liable to the same objections, and equally transcends the authority conferred on the legislature by the constitution.

Is it said that the rule laid down is not an inflexible or universal one,—that there are exceptions,—that the law providing for the support of paupers is one? Not so. Among the rights declared natural and inherent in all human beings by our constitution, is the right to life, and that necessarily includes and carries with it a right to the means of sustaining life. It is not merely common humanity, but common justice, that demands that no one shall be suffered to languish for lack of food, clothing, and other necessaries of life. To provide the means of preventing it is strictly within the line of public duty.

Thus far we may safely proceed toward an agrarian distribution of the fruits of the earth and the products of human industry; and in doing so, we are only establishing justice and insuring tranquillity. But this is no precedent for going further, and furnishing to any beggar, however wealthy, influential, or clamorous (and these are they whose applications are likely to be successful), out of the public treasury the means of trying some pet scheme for adding to his own gains at the public risk.

Neither can it be said that the statutory provisions for education, nor the occasional grants made to seminaries of learning, are liable to objection on the same score. One of the declared objects of the constitutional compact is to secure to ourselves and our posterity the blessings of liberty. The most effective instrumentality to this end is found in our schools and seminaries. Indeed, the nearest approach to an exception to the fundamental principle we have adverted to that has ever been in any manner recognized as valid by the courts, is to be found in the acts authorizing towns to loan their credit for the purpose of aiding in the construction of railroads.

It would be easy to make a distinction between that class of acts and those which are now proposed, in the very vital matter of the

relation which railroads bear to those objects which are confessedly public and expressly recognized in the constitution as the objects for which the government was formed, and to the whole people, as a means of intercommunication, but more especially because they are becoming almost indispensable in order "to provide for our mutual defense," affording as they do means of transportation for men and munitions of war in numbers and quantities, and at a rate of speed which can be attained in no other way.

But the question of the validity of these acts is not the one now before us, and the true answer to those who rely on their analogy to the system of legislation here, and now under consideration as an argument in favor of the validity of the latter, is that the fact that one step of doubtful propriety has been taken is never a good reason for taking a further step in the same direction, but rather, on the contrary, it should induce us to pause and revert to fixed principles.

I have thus far been considering the class of acts referred to in your first question, authorizing towns to make gifts of money or loans of credit to assist individuals and corporations to establish or carry on manufacturing business of various kinds within or without the limits of such towns; and I have called attention to a fundamental principle regulating the power of taxation which forbids it for any but public objects, and have shown that those are not public objects which cannot be classed with those to secure which government was instituted, nor can those burdens be said to be imposed for public purposes which enure primarily to the advantage of private individuals or corporations, affording to the community only a secondary and incidental benefit.

We are now to consider the question of the constitutional validity of the class of proposed acts referred to in your second question,—acts authorizing towns to establish manufactures on their own account, and run them by the ordinary town officers or otherwise. It seems hardly possible that any one will be found to affirm that undertakings of this description can, by even the greatest latitude of construction, be included among the objects for which the government, and the power to raise money by taxation to meet the wants and accomplish the aims of the government, were created.

What has been already said about the invalidity of assessments made for any other than the legitimate purposes of government applies to the legislation referred to in the second question.

But I answer both these questions in the negative, because—

2. Such legislation would be utterly subversive of so much of Art. I, § 1, of the constitution as affirms the right of our citizens as individuals to acquire, possess, and protect property,—a right which may be conveniently designated as the right of private property.

Taxation, however heavy, if limited to the objects which the government was instituted to secure, does not infringe this right, because its very existence depends upon the maintenance of civil government; but taxation for any other purpose is a practical denial of the right, and a handing over of every man's property to those who can command a majority of the votes in his State or precinct.

It seems unnecessary to elaborate or illustrate these positions, or to attempt to prove the self-evident proposition that government was not instituted for the purpose of engaging in manufactures or trade. The right of private property is not only declared in the constitution to be one of the natural rights of all men, but its security is guarded by further constitutional provisions forbidding the taking of such property, even for public uses, without just compensation, nor unless the public exigencies require it.

Touching this right, Weston, C. J., remarks in *Comins* v. *Bradbury*, 10 Maine, 449, most truthfully as follows : " And the history and experience of mankind proves that it is essential to individual and to public prosperity, that every man should be secure in the enjoyment of the fruits of his own industry. The force of this principle cannot in any degree be impaired, without relaxing the springs of exertion and enterprise."

What must necessarily be the effect of this proposed intrusion of municipal organizations, backed by the power of taxation, into the field which immemorial usage has hitherto reserved to private energy and enterprise ? What private operator could venture to compete with those who should be made the recipients of the public favor, or with the municipality in which he lives controlling all the property taxable in that precinct, for the support of its own

operations in the same line ? Government monopolies in manufactures and trade have sometimes existed in despotic or semi-despotic governments ; but the inevitable effect of them is " to relax the springs of exertion and enterprise."

It is true it may be said that this consideration bears upon the expediency rather than upon the constitutionality of these schemes ; but behind this stands the fatal objection to any legislation of the description proposed, that when you compel a man to contribute, at the fiat of a town meeting, to objects other than those which the government was framed to secure, you destroy his constitutional right to possess and protect property, which he can thereafterwards only hold subject to the determination of a majority of his townspeople.

The people of Maine have not yet adopted a constitution which, upon any reasonable interpretation, makes the tenure of private property so uncertain. WILLIAM G. BARROWS.

*To the House of Representatives of the State of Maine :*

I have the honor herewith to submit the following communication in answer to the interrogatories annexed.

RUFUS P. TAPLEY.

OPINION BY TAPLEY, J.

These inquiries do not leave my mind entirely clear as to the information sought by them. If they relate to purely private enterprises in nowise connected with public uses or the public exigencies, I answer without hesitation in the negative. This conclusion is so clear to my mind, and so free from all doubt, that I can hardly persuade myself that the house of representatives really needed or desired the opinion of any one upon the subject. Coupled with this fact is the fact somewhat notorious that an opinion is somewhat prevalent that the aid referred to may legitimately be given when the enterprise is regarded as beneficial both to the public and the private individual. If the inquiry relates to those cases where the public interest as well as private benefit is to be subserved, something more than a simple affirmative or negative answer seems to be required. The doubt which remains in my mind as to the real

design and purpose of the inquiry must be my apology if I go beyond their scope and purpose.

In the determination of questions of law the court always receive great aid from the researches and discussions of able counsel acting for interested parties, and when questions are presented in the manner these now come to us we proceed to their determination with some hesitation and embarrassment.

The reflection, also, that the same questions may arise between party and party in the course of legal proceedings in the courts, together with the fact that other official duties limit and circumscribe us in the time to be devoted to the investigation, still farther increase the embarrassments of such occasions.

We can only proceed in the investigation upon the views of the law appertaining to the question, as they appear to us upon first presentation, and anticipate as well as we can the ground which may be urged for or against the proposition presented, never regarding the opinions thus formed as conclusive, but open to review upon every proper occasion.

Under whatever form of proceeding the aid contemplated is furnished in any given case, I think, if justified, its justification must be found in that principle of all governments which invests the sovereign power with the right to take and use any property within its jurisdiction for necessary public uses. This is a principle not peculiar to our government or our form of government, but one existing in all governments, and one not resting upon edict, but one resulting from necessity. It is sometimes termed the right of eminent domain.

### EMINENT DOMAIN.

Chancellor Kent says of this right, " private property must, in many instances, yield to the general interest. The right of eminent domain, or inherent sovereign power, gives to the legislature the control of private property for public uses, and for public uses only." Kent's Com., vol. 2, p. 333.

Judge Story says, " the right of eminent domain is usually understood to be the ultimate right of the sovereign power to appropriate not only the public property, but the private property of all

citizens within the territorial sovereignty to public purposes." 11 Peters, 641.

Numerous definitions of this right might be cited, all of which convey the same idea. Under our constitution a limitation is imposed upon this right; it is in these words: " Private property shall not be taken for public uses without just compensation; nor unless the public exigencies require it." Maine Laws, Art. 1, § 21.

Under this provision of the constitution it has been said by the supreme court of this State in one case, that " the right of eminent domain is an attribute of sovereignty, and confers upon the legislature authority to take private property for public uses when the public exigencies require it, subject only to that provision in our constitution which exacts just compensation." 47 Maine, 345.

In another case it is said, " except for public uses private property may not be taken by the dominant power of the State, nor for public uses without just compensation; nor even then unless the public exigencies require." 40 Maine, 317.

Without entering at this time into a discussion or recapitulation of the reasons for the rule, and the necessities which require it, I hold that the taking of private property, against the will of the owner, must find a justification in some public use and under some public exigency, and accompanied by a just compensation, and this is true whether the property be taken by a direct seizure of it in specie, and irrevocably committing it to a use, or by the indirect method of a loan, accompanied by some fancied or real security for a subsequent reimbursement.

Some distinction has been sought to be made between the right to seize specific articles of property for a public use, and obtaining money through the ordinary forms of taxation, and we sometimes hear of a justification under the taxing power of the government. I am not able to perceive the soundness of the distinction. I understand that the right and power of taxation rests upon the right as described by Judge Story, " of the sovereign power to appropriate, not only the public property, but the private property, of all citizens within the territorial sovereignty, to public purposes." The difference is in the mode of taking only.

The use in both instances is a public one, and in both instances

the right is founded upon the same principle. Certain principles govern the modes of procedure in each case, but the elemental authority rests upon the principle that the property within the sovereignty is held subservient to the necessities of the sovereignty.

## PUBLIC USE.

What is a public use is abstractly a question of law, and like many other unambiguous expressions, having a technical meaning, is not so easily defined in other terms as one would ordinarily suppose. It must, undoubtedly, be a use designed to subserve some public interest or demand, an interest or need of a public character as contradistinguished from that of a private character. It need not be a use in which all the individuals of the public are equally interested. One may be benefited very much more than another, and yet it may be a public use within the meaning of the constitution. Numerous cases have decided this point, and it matters not that some private interest may be subserved to a much higher degree than the public, it may nevertheless be, within the purview of the constitution, a public use.

## PUBLIC EXIGENCY.

So it may be said that what is a public exigency may be regarded as a question of law. Exigencies may be of very different degrees. Very different circumstances may produce exigencies. One may present an imperative demand and absolute necessity, an indispensable want and need, another may show that a certain use or object is highly desirable and will result in a manifest advantage and benefit to the public. The degree of exigency is not declared by the constitution. It is stated in general terms, but it being in the nature of a limitation upon the general law of eminent domain, I think it may well be assumed that something beyond a possible or probable advantage or benefit of a slight character was designed. That the mere fact that some unimportant use or benefit might be received is not enough, but that it must be such an use as the public needs and requires for its welfare and safety ; a substantial thing it ought to be possessed of.

### JUST COMPENSATION.

This term is so clear that it needs no comment by the court at this time. If any questions can arise concerning it, they arise rather upon the mode of determining what will amount to a. just compensation rather than the meaning of the term.

This constitutional provision (Sedgwick on Com. Law, 554) of which I have spoken as imposing a restriction or limitation upon the general law of eminent domain, evidently refers to the power to take the property in specie of one man and use it for the public, rather than that power possessed by the sovereign to seize in the form of taxation a ratable proportion of the whole for the benefit of the whole. When the property of one man is seized and used for the benefit of the whole community, it is just and equitable that the community should compensate him for his loss and their gain. He, among others of the community, contributes ratably to that compensation. When, however, for the ordinary purposes and expenses of the government, all are called upon to contribute according to the property they possess, the burden is equally borne by all, and each has his compensation in the general good promoted.

So far there is no difficulty in giving an answer to the inquiry proposed. The difficulties which arise are of a different character, and are upon questions of fact rather than questions of law. The perplexing question in some cases is, whether or not the object is a public one; whether the uses to which the means sought to be applied are public uses; and if property in specie is to be seized, whether a public exigency exists requiring it. If these facts exist, the right to take is established, and the only remaining question is one of policy and propriety under the circumstances.

As before remarked, whether or not these facts exist is not a question of law for the court. The result of such an investigation must depend upon circumstances made apparent by proof. In one instance clearly and indubitably shown, in another less clearly shown and of doubtful existence, and in another wanting entirely in all those elements necessary to bring it within the rule.

When facts are agreed, the results which legally flow from them are those produced by an application of the law, and what the results are, thus flowing from the facts agreed, are questions of law·

Were we here to give a simple affirmative or negative answer to the inquiries made, we must decide not only the law (unless the first construction we have given your inquiry is the right one) but the fact. We must go beyond the judicial line of inquiry and enter upon another. The decision of the one would be judicial, and as such entitled to respect coming from the court of last resort. The decision of the other would be extrajudicial, that of so many citizens, founded upon facts happening to be within the knowledge of those who form the opinion, and entitled to no more consideration than that of other persons equally intelligent, formed upon an imperfect knowledge of the facts, and, as courts are human, arriving in many instances to widely different conclusions.

The law is not thus uncertain; it rests upon certain well-defined and unquestioned principles.

The inquiry arises, then, who shall determine the question of fact? In my opinion it is the legislature, " all power is inherent in the people, and instituted for their benefit," is the language used in the " declaration of rights." They must determine, through the legislative department, when a law becomes necessary, and what law has become necessary. They must determine whether a thing is or not needed for a public use, and whether the public exigency requires it. Having so determined, there is no appeal to the judiciary. The judiciary are but a coördinate department of the government. They cannot make or unmake laws. When a case arises for the application of the law, they determine what the law is applicable to the case. If they should find two laws laid down relative to the matter, one a legislative enactment, and the other a constitutional provision made by the people before the legislature was formed, the law declared in the constitution is to them the paramount law, and the case is decided by that paramount law.

In this there is no conflict of action. It is a simple determination of each cause as it arises upon the laws as they exist. The common law must yield to the statute, and the statute to the constitution.

In Mr. Cooley's work upon Constitutional Limitations, he says: " The authority to determine in any case whether it is needful to exercise this power (of taking private property) must rest with the State itself." Page 528.

Mr. Justice Denio, in the case of *People* v. *Smith*, 21 N. Y., says: " The necessity for appropriating private property for the use of the public, or of the government, is not a judicial question. The power resides in the legislature. . . . The exercise of the right of eminent domain stands on the same ground with power of taxation. Both are emanations of the law-making power. They are attributes of political sovereignty, for the exercise of which the legislature is under no necessity to address itself to the courts."

Chancellor Kent says, " it undoubtedly must rest as a general rule in the wisdom of the legislature to determine when public uses require the assumption of private property." 11 Kent's Com. § 34, p. 415.

In the case of *Spring* v. *Russell*, 7 Greenl. 273, Chief Justice Mellen, giving the opinion of our court, says, " It is the unquestioned province of the legislature to determine as to the wisdom and expediency of a law, and how far the public interest is concerned."

When they arrive at the practical point of determining whether, in a given instance, the case is shown to be within these rules, the constituent must rely upon the intelligence and integrity of his representative. It is upon these he must rely in regard to all matters of legislation; with respect to the confiscation of his own property, in undue and unequal proportions compared with the contributions of others, he may rest securely upon the constitutional requirement of compensation when one mode is pursued, and an equal apportionment upon all, according to value, when the mode of taxation is pursued.

## POWER OF TAXATION.

Perhaps something should be said concerning the general power of taxing possessed by the government,—or rather something concerning the limitations, if any, imposed upon it.

Taxes should be imposed or levied for those purposes which properly constitute the public burden. They are levied to secure the performance of public duties, and relieve public necessities. These public burdens, public duties and necessities, are often the call of the public good and general welfare of the people, to be

promoted throu'h a great variety of channels; and the legislative department being the judge of those, the uses for public purposes have no limitation but that dictated by legislative wisdom, discretion, and conscience. A few citations of the opinions entertained by eminent men may serve to throw some light upon it.

In the same work from which I have before cited, Cooley's Constitutional Limitations, it is said: "The power to impose taxes is one so unlimited in force, and so searching in extent, that the courts can scarcely venture to declare that it is subject to any restrictions whatever, except such as rest in the discretion of the authority which exercises it. It reaches to every trade or occupation; to every object of industry, use, and enjoyment; to every species of possession; and it imposes a burden, which in case of failure to discharge, it may be followed by seizure and sale, or confiscation of property. No attribute of government is more pervading, and at no point does the power of the government affect more constantly and intimately all the relations of life, than through this power." Page 479.

Chief Justice Marshall said, "The power of taxing the people and their property is essential to the very existence of government, and may be legitimately exercised in the object to which it is applicable to the utmost extent to which the government may choose to carry it. The only security against the abuse of this power is found in the structure of the government itself. In imposing a tax, the legislature acts upon its constituents. This is in general a sufficient security against erroneous and oppressive taxation. The people of a State, therefore, give to their government a right of taxing themselves and their property; and as the exigencies of the government cannot be limited, they prescribe no limits to the exercise of this right, resting confidently on the interest of the legislature, and on the influence of the constituents over their representatives to guard them against its abuse." 4 Wheaton, 428.

In another case the same learned jurist said: "This vital power may be abused, but the interest, wisdom, and justice of the representative body, and its relations with its constituents, furnish the only security where there is no express contract against unjust and excessive taxation, as well as against unwise legislation generally." 4 Peters, 563.

Mr. Cooley says, " In determining this question, the legislature cannot be held to any narrow or technical rule. Certain expenditures are absolutely necessary to the continual existence of the government; but as a matter of policy it may sometimes be proper and wise to assume other burdens which rest entirely on considerations of honor, gratitude, or charity. The officers of the government must be paid, the laws printed, roads constructed, and public buildings erected; but with a view to the general well-being of society, it may also be important that the children of the State should be educated, the poor kept from starvation, losses in public services indemnified, and incentives held out to faithful and fearless discharge of duty in the future, by the payment of pensions to those who have been faithful public servants in the past. There will, therefore, be necessary expenditures, and expenditures which rest upon considerations of policy alone, and in regard to the one as much as to the other, the decision of that department, to which alone questions of State policy are addressed, must be accepted as conclusive." Page 488.

In one case it is said, " If there be the least possibility that the gift will be promotive in any degree of the public welfare, it becomes a question of policy and not of natural justice, and the determination of the legislature is conclusive." 32 Crom. 138.

The history of the State for the half century of its existence furnishes me no evidence of a want of intelligence, integrity, or just regard for the reserved rights of the people existing in their representatives. They need no opinion of mine as to whether the measures contemplated by the inquiry are politic or impolitic. It is to their judgment and not mine to which this question is addressed. The corrective, if any is needed for their acts, lies not in the courts if the act is within the line of constitutional authority, but with the people.

The various enactments, public and private, now found upon our statute books, show that the people of the State as a body have not been unmindful of the means necessary to promote the general good, whether it be by fostering institutions of learning, developing the natural and material resources of the State, encouraging agriculture and arts, or aiding in constructing ready and easy means

of communication and intercourse with each other. While some of these statutes seem to some to have gone to the very verge of constitutional limitation and authority, their results as a whole have exhibited the wisdom of those who designed them. As the State advances in population and available means of the enjoyment of a higher degree of civilization, old necessities no longer exist, and new ones take their place, and, as before remarked, when and where they exist must be and will be determined by the people acting through the legislative department of the government; and when the legislative department has declared that certain uses are of public utility, importance, and necessity, or that a public exigency has arisen, the courts, as a coördinate branch of government, ought not, and I trust will not, substitute their own judgment for that of the people thus expressed, and render nugatory their solemn acts performed under the solemn engagements they assume in the execution of duties devolving upon them.

The experience of the past will furnish some guide for the future. The deliberate judgment of others, formed under similar circumstances, is entitled to some consideration, at least, in forming our opinions. Changing conditions of men bring with them new demands, demands that must be granted or refused upon the application of old principles; principles although of long standing yet designed to meet the varying conditions of society; so inflexible as to preserve the rights of all, and yet so flexible as to meet all the requirements of a government designed to promote, to the highest degree, political equality in government and intelligence and morality in the people.

If the aid contemplated relates to purely private enterprises, in nowise connected with public uses or public exigencies, I answer in the negative. If, however, it relates to public uses and necessities connected with private, I answer, there may be cases where such aid may be legitimately authorized.         RUFUS P. TAPLEY.