# UNITED STATES, EX REL. THE MILES PLANTING AND MANUFACTURING COMPANY,

*v.*

## CARLISLE.

---

### Tariff; Sugar Bounty.

1. The repealing clause, paragraph 182, of the revenue act of Congress of August, 1894, (28 Stat. 521) expressly repealed those clauses of the revenue act of October 1, 1890, (26 Stat. 583) granting bounty to licensed sugar producers ; and such repeal had reference not only to licenses to be granted producers thereafter, but also to licenses granted and existing at the date of the passage of the act of 1894.
2. No contractural or vested rights to bounty were acquired by licensed sugar producers by a compliance with the requirements of the act of Congress of 1890, granting bounties under certain conditions, such as would entitle producers to compel a payment of such bounty by the United States.
3. The provisions of the revenue act of Congress of October 1, 1890, granting bounty to sugar producers, were unconstitutional and void.

No. 395.   Submitted November 23, 1894.   Decided January 8, 1895.

Hearing on an appeal by the relator from an order over-

ruling a motion to quash the return to a rule to show cause why a writ of mandamus should not issue, and dismissing the petition for such writ. *Affirmed.*

The COURT in its opinion stated the case as follows:

This is an appeal from a judgment dismissing a petition for a writ of mandamus. The petition was filed September 19, 1894, by The Miles Planting and Manufacturing Company, a corporation of the State of Louisiana, against John G. Carlisle, Secretary of the Treasury, and Joseph S. Miller, Commissioner of Internal Revenue of the United States.

The relator alleges that it is the owner of five different places, in the State of Louisiana, for the production of sugar; that under the inducement offered by the bounty provisions of the revenue act of October 1, 1890, commonly called the McKinley Bill, it met all the requirements necessary to make itself a licensed producer of sugar thereunder; and that in compliance with the requirements of the law it gave the notice, filed the application, and executed a bond for $251,000 as required by the law, and on July 2, 1894, received the necessary licenses for the production of sugar at each of its said places for the current year.

The petition sets out the provisions of the said act, which provide that the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, shall prescribe rules and regulations for the production of sugar, and, under the direction of the Secretary, shall exercise supervision and inspection of the licensed producers; and shall certify to the Secretary, after such supervision and inspection, the amount of money earned by each licensed producer, who shall have complied with the regulations, preliminary to payment under the appropriation made in the act.

It is further alleged, that the required rules and regulations were made and published August 18, 1892, and have never been altered or abolished; that in accordance with

its licenses aforesaid, relator gave notice and made application for inspection and supervision, as prescribed at each of its said places of production, for the sugar making season then about to begin; and that respondents refused to obey the law and denied the demand.

The prayer of the petition is for a rule on respondents to show cause why a peremptory writ of mandamus shall not issue commanding them to carry out their said regulations and the law, by exercising supervision and inspection as therein directed and provided for.

By way of return to the rule to show cause, the respondents filed an answer in which they did not deny the facts alleged in the petition, but based their refusal to comply upon the grounds that the act required was not ministerial; that the law had been repealed by the revenue act of August 28, 1894, and that, if unrepealed, it was not a valid law.

The relator moved to quash the return as insufficient; but the court, holding to the contrary, overruled the motion and dismissed the petition.

*Mr. Joseph L. Brent* and *Mr. George E. Hamilton* for the appellant:

1. The sugar bounty given by the McKinley law is not a mere gratuity. It belongs to that class of bounties which require that a privity be established between the Government and the acceptors before the proposed work can be undertaken. When these conditional offers are accepted in the form proposed, a legal contract is established from the date of acceptance. Parsons on Cont. (8th Ed.) 444; *Boston* v. *Bartlett*, 3 Cush. 226; 15 Atty. Gen. Opin. 227; *Moultrie Co.*, 92 U. S. 632; *U. S.* v. *Denver Co.*, 92 U. S. 2; *Union Pacific*, 91 U. S. 79; *Calder* v. *Henderson*, 54 Fed. Rep. 802. The obligation of the Government to pay the bounty, so far as appellant is concerned, arises from a legal contract, and in no way can be regarded as a revocable gift, even if the Government

derived no benefit from it, as appellant, at its previous request, performed labor and spent money to undertake the contract, which it is still under obligation to perform.

If it be denied that there was an express contract containing all the recited conditions, the circumstances appearing in the record certainly make an implied contract, and there is no difference in law in the binding efficacy of the obligations of either class of contracts.    1 Pars. on Cont. 6 N. L.

2. The new tariff act has not repealed the rights of appellant under the bounty act.   The repeal has reference only to licenses to be granted in future and not to those granted and existing at the time of the passage of the act. If appellant's rights were only those of a bare licensee, the repeal of the law authorizing the issue of the license would not destroy the license without an express declaration giving the repeal a retroactive effect, contrary to the declared intention of Congress and in violation of Sec. 13, R. S. U. S. *Bush* v. *Dist. of Columbia*, 1 App. D. C. 1.    But when we consider that the rights of appellant are more than those of a bare licensee, the whole mass of authorities contained in the text books and in adjudicated cases support the construction maintained by us, that repeals of statutes and existing rights are not to be made out by intendment, and no statute shall be given a retroactive effect in the face of its expressed or even implied intention.    *U. S.* v. *Heth,* 3 Cr. 397 ; *Sohn* v. *Williams,* 17 Wall. 598 ; *Chinese Act,* 114 U. S. 555 ; *U. S.* v. *Denver Co.,* 92 U. S. 2.   The saving clause preserves every right or claim, of whatsoever nature, from retroactive destruction, and the decisions quoted below show what feeble shadows of claims on the Government have been held to be property capable of transfer by effect of law and, *a fortiori,* capable of protection by law, and in every aspect the claim of appellant is stronger than those described in the cases referred to.    *Comegys* v. *Vasse,* 1 Pet. 193 ; *Williams* v. *Heard,* 141 U. S. 529.    The saving clause is an express declaration that the new tariff act shall not impair the obligations of

existing contracts or even equities, and thus preserves our rights under the principles of the cases restraining States from impairing the obligations of contracts. Potter's Dwarris on Stat. 162, n. 9.

In view of the saving clause and of the limitations on the power of Congress and, *a fortiori*, of the respondents, the existing validity of the appellant's right to bounty of 1894 must be upheld as if the new tariff had not been enacted. *Noble* v. *Water Co.*, 147 U. S. 165; *Pacific Sinking Fund*, 99 U. S. 700–718; *U. S.* v. *Lee*, 106 U. S., 196, 217–219.

3. Where private interests are concerned, the courts will control the discretion of officers, and reverse, in mandamus proceedings, their construction of the law. *Kendall* v. *Stokes*, 12 Pet. 527; *Butterworth* v. *Hoe*, 112 U. S. 51; *Noble* v. *Water Co.* 147 U. S. 165; *U. S.* v. *Schurz*, 102 U. S. 378; *U. S.* v. *Supervisors*, 4 Wall. 444. See also *Ins. Co.* v. *Baltimore*, 23 Md. 309; *McPherson* v. *Leonard*, 29 Md. 377; *Leonard* v. *Wiseman*, 31 Md. 205; *Mayn* v. *Stall*, 52 Md. 435.

*Mr. Edward B. Whitney*, Assistant Attorney General, for the appellees.

Mr. Justice SHEPARD delivered the opinion of the Court:

1. The first question to be considered is: Is this a case (conceding the validity of the act in question) in which a mandamus can be ordered?

The circumstances under which an executive officer may be compelled to perform an official act, and the principles applicable thereto, have been considered by us in two cases recently decided. *Seymour* v. *South Carolina*, 2 App. D. C. 240; *International Cont. Co.* v. *Lamont*, Id. 532, the last of which has been affirmed on appeal to the Supreme Court of the United States. 155 U. S. 303. Further discussion would add nothing new.

In the view that we have taken of the repealing clauses of the act of August 28, 1894, and their effect upon the claims of relator, we think it unnecessary to consume time

in an examination of the details of the old law and the regulations made thereunder, with a view to determine whether the acts required of the respondents call for the exercise of discretion, or are purely ministerial. If the act has been repealed, and the rights of the relator have fallen therewith, there remains no duty which the respondents could lawfully perform.

2. This brings us to the question whether the repealing clauses of the law now in force had the effect to at once repeal the bounty clauses of the act of October 1, 1890, and to take away all claims thereunder?

The repealing clause, specially directed to the sugar bounty provisions of the old law, reads as follows:

" Paragraph 182. That so much of the act entitled 'An act to reduce revenue, equalize duties, and for other purposes,' approved October first, eighteen hundred and ninety, as provides for and authorizes the issue of licenses to produce sugar, and for the payment of a bounty to the producers of sugar from beets, sorghum or sugar cane grown in the United States, or from maple sap produced within the United States, *be, and the same is, hereby repealed, and hereafter it shall be unlawful to issue any license to produce sugar or to pay any bounty for the production of sugar of any kind under the said act.*"

This is not only a direct repeal of that part of the act, but also an express prohibition of any further payment of bounty.

It is contended, on behalf of the appellant, that the words following the repeal, "And hereafter it shall be unlawful to issue any license to produce sugar," must be held to show that " this repeal has reference only to licenses to be granted in the future and not to licenses granted and existing at the passage of the act."

The meaning of the word *hereafter* must be controlled by the apparent general intent. Considering the length of time that the bill was on its passage and the changes that were

made from time to time in this repealing clause, before its final passage, it is not strange that the phrase, as finally worded, should lack something of precision. But without recurring to the proceedings in the House and Senate, or the debates therein, which are often unsafe guides to interpretation, we think it perfectly plain that the mere choice of this word, and its collocation, cannot be given the effect contended for.

The repealing clause is one complete sentence, and the words quoted above are followed by these: " or to pay any bounty for the production of sugar of any kind under the said act." If it had been contemplated that the rights of holders of licenses taken out before the repeal should be respected and recognized as lawful, this intention would have been manifested also in an exception to the sweeping prohibition of the payment of any further bounties after that date.

It is an undoubted rule of construction that the special meaning or purpose that might, under some circumstances, be found to lurk in a single word or part of a sentence, must yield to the plain intention disclosed by the whole.

The contention that by the use of the word *hereafter*, the plain intent of the clause is to cut off the bounty only as to licenses *thereafter* issued, seems far fetched and untenable. The clause making it unlawful to pay " any bounty " under the act then and there repealed, could only have application to licenses taken out by parties under the old law while the passage of the new one was delayed. No new license could be issued, and consequently no payment of bounty could be made thereunder after the repeal of the old law; hence the express prohibition of payment could only apply to claims made under the licenses that had been previously issued.

It is further contended that the relator, by reason of its compliance with the law then in force, is not a mere licensee, but must be considered as a party to a contract who has

acquired a vested right and property interest. Then, assuming this contractual relation, and the existence of a vested right, it is claimed that it is expressly protected and exempted from the operation of the repeal by the saving clause in paragraph 72, of the new law, as follows:

"Paragraph 72. All acts and parts of acts inconsistent with the provisions of this act are hereby repealed; but the repeal of existing laws or modifications thereof embraced in this act shall not affect any act done, or any right accruing or accrued, or any suit or proceeding had or commenced in any civil cause before the said repeal or modifications; but all rights and liabilities under said laws shall continue and may be enforced in the same manner as if said repeal or modifications had not been made."

This clause is substantially like the repealing clauses of former tariff or revenue acts, and was not intended to embrace or refer to the provisions of the act relating to the bounty. "These different parts of the act, in respect to their operation, have no legal connection whatever with each other. They are entirely separable in their nature, and, in law, are wholly independent of each other. One relates to the imposition of duties upon imported articles; the other to the appropriation of money from the Treasury for bounties on articles produced in this country." *Field* v. *Clark,* 143 U. S. 649.

For the foregoing reasons it was proper, if not necessary, to enact separate repealing clauses adapted to the nature of these two separate and distinct objects; besides the revenue part of the law was not abrogated, but substituted merely by another for the same general purpose.

In view of the special repealing clause relating to the bounty provisions of the act, paragraph 72 must be referred to the provisions of the tariff act alone. The saving of rights and liabilities thereunder was rendered proper and necessary by the enormous volume of business done under the act and the difficulties and litigation attending upon

its construction.  An unconditional repeal of its provisions, thereby terminating rights and destroying liabilities, accrued thereunder, would have been attended with great confusion and probable loss of revenue to the Government, as well as injustice to individuals.

Conceding the constitutionality of the bounty law, for the sake of argument, it is clear that the claim of petitioner by virtue of its licenses, even if it might be considered property as between third persons claiming the expectancy, constitutes but a step in the process of securing a mere bounty, or gratuity, offered by one Congress which another had the undoubted right to recall.  The authority for this view is overwhelming, and it is too plain to admit of question. *Salt Co.* v. *East Saginaw*, 13 Wall. 373 ; *Welch* v. *Cook*, 97 U. S. 541; *Newton* v. *Commrs.*, 100 U. S. 548; *United States* v. *Teller*, 107 U. S. 64; *Pennie* v. *Reis*, 132 U. S. 464; *Crenshaw* v. *United States*, 134 U. S. 99.

The claim under such an act is but a mere inchoate interest or right, at the best, and no more a contractual or vested right than has uniformly been held with respect to the right of an informer, or an officer, in penalties and forfeitures under revenue or penal laws.  *United States* v. *Morris*, 10 Wheat. 246; *Norris* v. *Crocker*, 13 How. 429; *Dorsheimer* v. *United States*, 7 Wall. 166.

Our conclusion, therefore, is that the repeal of the bounty provisions of the act of October 1, 1890, was immediate and complete, without excepting or protecting any such right as relator claims thereunder, and consequently there remains no duty with respect thereto that the respondents might or could lawfully perform.

3. The constitutionality of the bounty law has been raised by the respondents and fully argued.  Whilst its decision might be evaded under our conclusion with respect to the repeal of the law, we think the question one that should be met and determined.

The situation is very different from that presented to the

Supreme Court in *Field* v. *Clark.* There the question was not distinctly involved in nor necessarily incidental to the matter in controversy. Congress had enacted the law, the Executive had approved it, and the executive officers recognized its validity and were engaged in its execution. The great pecuniary interests to be affected were not before the court and might have been injured without a hearing. Here the question is raised by the officers of the Government and its decision invited. The party at interest is the actor in the litigation, and began its suit with the knowledge that, if correct in its other contention, this question lay directly in the path of its prayer for relief.

The power of Congress to pay bounties to manufacturers or producers in order to encourage the manufacture or production of any article has never been passed upon by the courts. By the very nature of Federal taxation and appropriations of public money, questions respecting their validity are very difficult to be raised. There is no simple mode of challenge, as is the case in the States where the taxpayer, having a direct interest, can invoke relief through injunction, if need be.

We have already referred to the case of *Field* v. *Clark*, and the manner in which the question there arose and the reasons for which it was not decided. *Calder* v. *Henderson*, 2 U. S. App. 627, has been cited as upholding the power, but the question was not involved in the case. The question there was, simply, whether the inchoate right to the bounty, of a licensee, recognized by the law and the executive officers of the Government, passed to his assignee for the benefit of his creditors, and it was held that it did. As between the parties, it was held to be an expectancy which could be assigned as property, under the authority of *Williams* v. *Heard*, 140 U. S. 529; *Comegys* v. *Vasse*, 1 Pet. 193, and other cases.

The principle, however, which underlies the question, and upon which its solution depends, has, in our opinion, been

time and again asserted and applied in the court of last resort in such cases, beginning with *Calder* v. *Bull*, 3 Dall. 386. In that case, Mr. Justice Chase announced a sound doctrine as regards the construction of legislative powers in this country in vigorous language, from which we quote: " I cannot subscribe to the omnipotence of a State legislature, or that it is absolute and without control, although its authority should not be expressly restrained by the constitution or fundamental law of the State. The people of the United States erected their constitutions or forms of government *to establish justice, to promote the general welfare, to secure the blessings of liberty, and to protect their persons and property from violence.* The purposes for which men enter into society will determine the nature and terms of the social compact ; and as they are the foundation of the legislative power, they will decide what are the proper objects of it. The nature and ends of legislative power will limit the exercise of it. . . . There are acts which the Federal or State legislature cannot do, without exceeding their authority. There are certain vital principles in our free republican governments which will determine and overrule an apparent and flagrant abuse of legislative power; as to authorize manifest injustice by positive law ; or to take away that security for personal liberty or private property, for the protection whereof the government was established. An act of the legislature (for I cannot call it a law) contrary to the great first principles of the social compact, cannot be considered a rightful exercise of legislative authority. The obligation of a law in governments established on express compact and on republican principles must be determined by the nature of the power on which it is founded."

The learned justice then proceeds to enumerate certain laws that might be enacted, and among them "a law that takes property from A and gives it to B," and says again: "The genius, the nature, and the spirit of our State governments amounts to a prohibition of such acts of legislation;

and the general principles of law and reason forbid them. . . . To maintain that our Federal or State legislatures possess such powers, if they had not been expressly restrained, would, in my opinion, be a political heresy altegether inadmissible in our free republican governments."

This impressive declaration of the limitations upon legislative power, pronounced in 1798, has lost none of its force or vitality through lapse of time, but has been substantially affirmed and reaffirmed in cases before the same high tribunal and others. *Loan Association* v. *Topeka,* 20 Wall. 655. The point decided in that case was that an act of the legislature of Kansas authorizing and empowering cities and towns to encourage the establishment of manufactories and such other enterprises as may tend to develop and improve such cities, either by direct appropriation from the general fund or by the issuance of bonds, was beyond the power of the legislature, and therefore void.

The truly great opinion of Mr. Justice Miller therein affirms the doctrine of Justice Chase in *Calder* v. *Bull,* and advances it further in application to the great power of taxation. He says: "It must be conceded that there are rights in every free government beyond the control of the State. A government which recognized no such rights which held the lives, the liberty, and the property of its citizens subject at all times to the absolute disposition and unlimited control of even the most democratic depositary of power, is, after all, but a despotism of the many—of the majority, if you choose to call it so; but it is nevertheless a despotism. . . . The theory of our governments, State and National, is opposed to the deposit of unlimited power anywhere. The executive, the legislative, and the judicial branches of these governments are all of limited and defined powers. There are limitations on such power which grow out of the essential nature of all free governments. Implied reservations of individual rights, without which the social compact could not exist, and which are respected by ·

all governments entitled to the name. . . . To lay with one hand the power of the government on the property of the citizen, and with the other to bestow it upon favored individuals to aid private enterprises and build up private fortunes, is none the less a robbery because it is done under the forms of law and is called taxation. This is not legislation; it is a decree under legislative forms. Nor is it taxation. . . . We have established, we think, beyond cavil, that there can be no lawful tax which is not laid for a public purpose. It may not be easy to draw the line in all cases so as to decide what is a public purpose in this sense and what is not. . . . But in the case before us, in which the towns are authorized to contribute *aid by way of taxation to any class of manufactures*, there is no difficulty in holding that this is not such a public purpose as we have been considering. If it be said that a benefit results to the local public of a town by establishing manufactures, the same may be said of any other business or pursuit which employs capital or labor. The merchant, the mechanic, the innkeeper, the banker, the builder, the steamboat owner, are equally promoters of the public good and equally deserving the aid of citizens by forced contributions. No line can be drawn in favor of the manufacturer which would not open the coffers of the public treasury to the importunities of two-thirds of the business men of the city or town."

The only dissent from the judgment and the opinion in that case was by Mr. Justice Clifford, who maintained the absolute power of the legislature of the State, save when restrained by the provisions of its own or of the Federal Constitution. The doctrine of the case has been sustained and followed by a unanimous court in two later cases, presenting substantially the same issues. *Parkersburg* v. *Brown,* 106 U. S. 487; *Cole* v. *La Grange,* 113 U. S. 1.

In the second of those cases, Mr. Justice Gray, speaking for the whole court, said: " The general grant of legislative power in the constitution of a State does not enable the legis-

lature, in the exercise either of the right of eminent domain or of the right of taxation, to take private property, without the owner's consent, for any but a public object.  Nor can the legislature authorize counties, cities or towns to contract, for private objects, debts which must be paid by taxes.  It cannot, therefore, authorize them to issue bonds to assist merchants or manufacturers, whether natural persons or corporations, in their private business.  These limits of the legislative power are now too firmly established by judicial decisions to require extended arguments upon the subject.'  After citing *Loan Association* v. *Topeka,* and *Parkersburg* v. *Brown,* he adds: " The decisions in the courts of the States are to the same effect" (citing a number of them), and, " we have been referred to no opposing decision."

To the cases cited by Mr. Justice Gray may be added the following, some of which were cited in *Loan Association* v. *Topeka*: *Opinions of the Judges,* 58 Me. 587 ; *Curtis* v. *Whipple,* 24 Wis. 350; *People* v. *Salem,* 20 Mich. 452 ; *Hanson* v. *Vernon,* 27 Iowa, 28; *Matter of Niagara Falls and Whirlpool R.R. Co.,* 108 N. Y. 375; *Deal* v. *Mississippi Co.,* 107 Mo. 464. The last case cited is directly in point here ; the court holding therein that an act of the legislature authorizing the payment of bounties for the planting of trees upon private lands, was an unconstitutional exercise of legislative power.

*Lowell* v. *Boston,* 111 Mass. 454, which was cited with the express approval in both *Loan Association* v. *Topeka* and *Cole* v. *La Grange,* is one of the best considered cases upon the question of the power of the legislature to impose taxes in aid of private enterprises for the promotion of the general welfare.  The act under consideration was enacted by the legislature of Massachusetts, after the great Boston fire of 1872, and authorized the city to issue bonds to raise money to be lent to land owners for the purpose of rebuilding in the burned districts.  In one sense in which this loan might be considered for the general welfare, and, in the same sense in which the subsidy to sugar producers is contended to be

therefor, the purposes of the loan act were for the good not only of the city of Boston, but also of the State, and, in a measure of all New England, of which Boston is the commercial metropolis.    This ground of support for the act was presented in a masterly manner, on the argument, by Mr. Benjamin R. Curtis, from whose brief we quote the following : " The primary object of the statute is not to benefit and aid private persons.    It purpose and end are strictly of a public nature; to restore and increase the taxable property and resources of the State ; to prevent and guard against the great evils and losses arising from so great and general a calamity, in embarrassing business, deranging finances, and seriously lessening the wealth and prosperity of a large and most important part of the whole people and interfering with their comfort, happiness, and progress."

To this argument, Mr. Justice Wells, who delivered the opinion of the court, made the conclusive reply : "The power to levy taxes is founded on the right, duty and responsibility to maintain and administer all the governmental functions of the State, and to provide for the general welfare.    To justify any exercise of the power requires that the expenditure, which it is intended to meet, shall be for some public service or some object which concerns the public welfare. The promotion of the interests of individuals, either in respect of property or business, although it may result incidentally in the advancement of the public welfare, is, in its essential character, a private and not a public object.    However certain and great the resulting good to the general public, it does not, by reason of its comparative importance, cease to be incidental.    The incidental advantage to the public, or to the State, which results from the promotion of private interests and the prosperity of private enterprises or business, does not justify their aid by the use of public money raised by taxation or for which taxation may become necessary.    It is the essential character of the direct object of the expenditure which must determine its validity as

justifying a tax, and not the magnitude of the interests to be affected, nor the degree to which the general advantage of the community, and thus the public welfare, may be ultimately benefited by their promotion. The principle of this distinction is fundamental. It underlies all government that is based upon reason rather than upon force."

In an analogous case, Mr. Justice Brewer, speaking for the Supreme Court of Kansas, of which he was then a member, said : " Public aid to private purposes cannot be secured by yoking them to a public purpose. And where the public and private purposes are attempted to be aided by a single concession, the latter vitiate rather than the former uphold, the grant." *Central Branch U. P. RR. Co.* v. *Smith,* 23 Kan. 533.

Nor was the decision of either of those cases made to turn upon a mere question of " municipal authority," but instead upon the broad question of " legislative power." As said by Wells, Justice : " The point of difficulty is not as to the distribution of the burden by allowing it to be imposed upon a limited district within the State; but as to the right of the legislature to impose or authorize any tax for the object contemplated by this statute."

The power here involved is one of taxation. The annual bounty for sugar production has necessarily come out of the revenues raised by general taxation for the support of the government. The gross sum required each year had to be included in the estimates for annual expenses and considered in the imposition of taxes to raise the revenue to meet them. Call the subsidy offered by the law to the producers of sugar a contract, if you will ; still it is necessarily one where " the right to contract must be limited by the right to tax, and if in the given case no tax can lawfully be levied to pay the debt, the contract itself is void for want of authority to make it. . . . The validity of a contract which can only be fulfilled by a resort to taxation, depends on the power to levy the tax for that purpose." Miller, J., 20 Wall. 660.

In *Field* v. *Clark*, 143 U. S. 649, Mr. Justice Harlan, referring to the question therein raised as to the validity of the sugar bounty provisions of the act under consideration, said: "The question of constitutional power thus raised depends principally, if not altogether, upon the scope and effect of that clause of the Constitution giving Congress the power 'to lay and collect taxes, duties, imposts, and excises, to pay the debts and provide for the common defense and general welfare of the United States.'"

To avoid any misunderstanding as to the scope of this decision, it is proper to add here that there are other delegations of power in the Constitution which expressly or impliedly permit the expenditure of the public moneys. Some of these have been mentioned by Mr. Justice Gray, in his opinion in *Cole* v. *La Grange*, 113 U. S. 1, and others might be added, as, by general consent, arising under the war power, the powers to regulate commerce, coin money, establish postoffices and postroads and so forth. No one of these is involved in this case; and with their construction we have nothing to do.

The power to give the bounty to producers of sugar must, as we have seen, be referred to, and determined by, the general grant in the first clause of Section 8 of Article 1. That there is no pretense of any other authority for the grant is further shown by this proposition, quoted from the brief of Mr. Brent, of counsel for appellant: "The able men who enacted .this bounty law never justified it upon the ground that a gratuity was intended to the licensees; but, realizing, with the statesmen of Europe, that the prosperity of the commonweal would be advanced by an increased production of domestic sugar which, while giving an increased stimulus to agriculture, would, by avoiding the necessity of sending abroad a hundred millions in gold annually to pay for foreign sugar, give an increased stability to our national finances, determined, in pursuance of a national policy, analogous to that adopted by Germany and

France, to stimulate the production of American sugar by offering to parties special inducements to invest capital and labor in the effort to develop the domestic sugar production in furtherance of such a national policy."

The power to levy taxes is one of the greatest, and to the citizen one of the most directly important, powers that can be exercised by any government. Within certain conceded boundaries, it is absolute, and unlimited save by the discretion of the law making power. It may be used to cripple or even destroy an industry or a business. The only refuge from its inordinate exercise, in this country, is by the peaceful revolution of popular elections. In our judgment, the true limitation of the power to impose taxes, conferred by the foregoing clause, is that the purpose must be public, that is to say, governmental.

"All definitions of taxation imply that it is to be imposed only for public purposes." Cooley on Taxation, 67.

" If there is any proposition about which there is an entire and uniform weight of judicial authority, it is that taxes are to be imposed for the use of the people of the State in the varied and manifold purposes of the Government, and not for private objects or the special benefit of individuals. Taxation originates from and is imposed by and for the State." *Allen* v. *Jay*, 60 Me. 128 ; *Hanson* v. *Vernon*, 27 Iowa, 28, 47 ; *Matter of Washington Av.*, 69 Pa. St. 352, 363 ; *Sharpless* v. *Mayor, &c.*, 21 Pa. St. 147.

"Vast as is the power of the Government to levy taxes upon its citizens, there are nevertheless limitations upon it of a very distinct and positive character which inhere in the very nature of the power itself. Some of these limitations are commonly declared in the written constitutions, but the declaration is rather from abundant caution than from any necessity, as the limitations are equally imperative whether thus declared or not." Cooley on Taxation, 41.

The authorities from which we have so freely quoted

refer directly to the power to tax as exercised by the legis-
latures of the several States; but the doctrine which they
establish is plainly applicable to the taxing power of
Congress.

A commonly accepted doctrine with respect to the legisla-
tive powers of the States has been that they are general in
their nature and to a degree absolute, except where restrained
by the provisions of their own and the Federal Constitution,
and the necessary implications therefrom. On the other
hand, it has been uniformly held that the Government of
the United States is one of " delegated, limited and enumer-
ated powers." *United States* v. *Harris*, 106 U. S. 629. In
that case it was said : " Therefore every valid act of Con-
gress must find in the Constitution some warrant for its
passage. This is apparent by reference to the following
provisions of the Constitution " (quoting Sec. 1, Art. I; Art.
X, Amendments). Mr. Justice Story in his Commentaries
on the Constitution, says : " Whenever, therefore, a question
arises concerning the constitutionality of a particular power,
the first question is whether the power be expressed in the
Constitution. If it be, the question is decided. If it be
not expressed, the next inquiry must be, whether it is
properly an incident to an express power and necessary to
its execution. If it be, then it may be exercised by Congress.
If not, Congress cannot exercise it."

This distinction between the taxing powers of the general
and the State governments is well described by the late Mr.
Justice Miller, in the following words: "The United States
being a limited form of government, one of the restrictions
to which it is subject is in regard to its power to levy taxes.
The States may levy them for a great many purposes for
which Congress cannot, because to the States belong all the
powers not delegated to Congress. Hence, while the Con-
stitution of the Unted States has nowhere been amended by
any limitations of its taxing power there has scarcely been
a State constitutional convention in half a century that has

not imposed some restrictions upon the power of the State to levy taxes." Lectures on Constitution, 247.

If then, as we have seen from the cases cited, the legislature of a State has no implied power to grant subsidies or bounties to individuals, though, in a sense, the general welfare may be promoted thereby, *a fortiori* the Congress of the United States has no such power.

It would be an useless consumption of time to enter upon a discussion of the interpretation of the language contained in the first clause of Section 8, Article 1, of the Constitution ; nor is it necessary to do so. Several theories have been indulged in that regard. Mr. Madison, in No. 41 of the Federalist, denounces the assumption that this clause " amounts to an unlimited commission to exercise every power which may be alleged to be necessary for the common defense or general welfare," and says : " No stronger proof could be given of the distress under which these writers labor for objections than their stooping to such misconstruction." He evidently regarded it as a mere general expression and fraught with no special meaning as a substantive delegation of power. He says : " Nothing is more natural nor common than first to use a general phrase, and then to explain and qualify it by particulars ;" and then refers to the fact that this language is " a copy from the Articles of Confederation."

It may be remarked here, too, that many of the State constitutions contain similar general declarations ; notably is this the case with Massachusetts and Maine, in both of which it has been held, as we have seen, that bounties cannot be given to individuals, in the promotion of the general welfare. Let it be conceded, however, that the words, " to pay the debts and to provide for the common defense and general welfare of the United States," are to be construed, according to the opinion of Mr. Justice Story, as a qualification of the preceding tax clause and as limiting " the taxing power to objects for the common defense and general welfare " (1

Story Const. 911); still the question remains, is the grant of a bounty to producers of sugar a constitutional exercise of the power of taxation as so understood?

We think the authorities cited above establish beyond question that the power of taxation, in all free governments like ours, is limited to public objects and purposes governmental in their nature. No amount of incidental public good or benefit will render valid taxation, or the appropriation of revenues to be derived therefrom, for a private purpose.

Although we have quoted liberally from authorities cited in support of these propositions, the importance of the question is such that we cannot refrain from quoting from the opinions of the judges of the Supreme Court of Maine, in response to the inquiry of the legislature of that State, language which expresses our views perfectly:

" Taxation, by the very meaning of the words, is for public purposes, and for those the right of the government is unlimited. . . . The general benefit of the community resulting from any description of well-directed labor is of the same character, whatever may be the branch of industry upon which it is expended. All useful laborers, no matter what the field of labor, serve the State by increasing the aggregate of its products—its wealth. There is nothing of a public nature any more entitling the manufacturer to public gifts than the sailor, the mechanic, the lumberman, or the farmer. Our Government is based upon equality of rights. All honest employments are honorable. The State cannot rightfully discriminate among occupations, for a discrimination in favor of one branch of industry is a discrimination adverse to all other branches. The State is equally bound to protect all, giving no undue advantages, or special and exclusive preferences, to any." 58 Me. 593. Again it was said: "But the subtle and sophistical argument of those who are seeking their own private advantage by the use of the public purse is, that the successful establishment of a

manufacturing business, though the profits of it inure to private individuals, is indirectly a benefit to the community. But this is not an answer; it is simply a pretext for an invasion of the fundamental principles above stated." Id. 609.

If it may be for "the general welfare of the United States" to encourage the production of sugar by the grant of a bounty, it is hard to conceive why the producers of corn, wheat, cotton, wool, coal, iron, silver ore, etc., might not be paid a bounty also.

If Congress be conceded the power to grant subsidies from the public revenues to all objects it may deem to be for the general welfare, then it follows that this discretion, like all admitted powers of taxation, is absolute. Such a doctrine would destroy the idea that this is a Government of "delegated, limited, and enumerated powers," render superfluous all the special delegations of power contained in the Constitution, and open the way for a flood of socialistic legislation, the specious plea for all of which has ever been "the general welfare." It is a doctrine that we cannot subscribe to.

Still less are we able to subscribe to a doctrine that legislation may be enacted by Congress "in pursuance of a national policy analogous to that adopted by Germany and France," or any other government on the face of the earth. There is no inherent sovereignty in the general or in the state governments. The people are sovereign. Certain powers of sovereignty they have delegated with a free hand; others have been reserved. Legislation by the Assembly of France, the Reichstag of imperial Germany, or the Parliament of Great Britain, where power is unlimited, furnishes no proper precedent for legislation in this country.

Our Revolution began in a protest against the arbitrary power of legislation, especially with respect to taxation. The successful result of that revolution gave us our written constitutions, State and Federal, wherein the people, to guard against dangers to life, liberty and property, reserved

to themselves powers that formerly had been exercised by government.

"A written constitution is in every instance a limitation upon the powers of government in the hands of agents; for there never was written a republican constitution which delegated to functionaries all the latent powers which lie dormant in every nation, are boundless in extent, and incapable of definition."

Instead of furnishing analogies by which our national policy ought to be guided, and the powers of our legislative bodies interpreted, the legislation of even the freest nations in the Old World serves better to illustrate the wisdom of our written constitutions and to warn against their violation either in letter or in spirit.

We have been referred to certain acts of Congress in the past as affording a practical construction of the Constitution in this regard, and furnishing a rule for our guidance. The rule is well established that, in case of doubt, the court will never declare a law unconstitutional. It is also well settled that long and frequent exercise of a power by Congress is entitled to the most respectful consideration and is not to be diregarded, except for cogent and most persuasive reasons. But at the same time, to have this great weight, the practical construction must have been long continued, repeated and generally unquestioned, and it cannot then be folllowed against " a conviction that such legislation is clearly incompatible with the supreme law of the land." *Field* v. *Clark*, 143 U. S. 649, 691; *Merritt* v. *Cameron*, 137 U. S. 542, 552.

It would extend this already too long opinion to a most unreasonable length to review the various acts and appropriations of Congress which are claimed to be in exercise of the same power invoked to support the sugar bounty act.

In his Commentaries on the Constitution (Sec. 991), Mr. Justice Story refers to acts, of which the most important, and the nearest in approach to this act, are the several acts relating to drawbacks and bounties to persons engaged in

the cod fisheries, beginning in 1790. He refers to the debates published by Elliot, and declares this a recognition of the power of Congress to give bounties. The history of these acts shows that the first was expressly enacted as a " drawback " of the duty upon the salt used in curing the fish. The full debates are reported in the Annals of the Second Congress (pages 362, 401), and show that the second bill could hardly have been passed except upon the view, strenuously contended for, that the money appropriated was the equivalent of a drawback of the salt duty, as before, and acted substantially in that way. Upon this view Mr. Madison finally gave the bill his support.

All such acts, however, no matter how worded or devised, have met with determined opposition and denial of power at all times; and it cannot be said that they have ever received general consent or acquiescence. The fact that moneys have often been paid out under acts of doubtful or questionable validity can have no great weight, under a system where the question, by reason of difficulties before alluded to, is so hard to be raised in an effective manner.

But if there had been a practice by Congress, uniform and generally acquiesced in, our opinion is so clearly against the validity of this act that we could not be controlled by it in the performance of our duty. No time, no acquiescence, no estoppel runs against the people under the protection of our written Constitution.

From what has been said, it follows that *the judgment below must be in all things affirmed; and it is so ordered, with costs to the appellees.*

Mr. Chief Justice ALVEY, concurring:

I fully concur with my brothers in the affirmance of the judgment appealed from in this case. But I do so upon the distinct grounds that the statute authorizing the payment of the sugar bounty has been expressly repealed by the recent tariff act of 1894, and thereby all right to bounty

5 Ct. App.—11

has been cancelled; and even if that were not so, the case as here presented shows no sufficient foundation for the issuing of a mandamus against the Secretary of the Treasury and the Commissioner of Internal Revenue. I do not, however, deem it necessary, for any purpose of this case, to discuss and decide the constitutional question of the power of Congress to provide for the payment of bounties in such case as that provided for by the late tariff act of 1890. I prefer to express no opinion upon that subject.